UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| STEPHEN PARKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CIVIL CASE NO. CV-06-129-GZS** |
| | ) | |
| | ) | |
| CITY OF SOUTH PORTLAND, et al., | ) | |
| | ) | |
| Defendants | ) | |

**DEFENDANTS CITY OF SOUTH PORTLAND, SOUTH PORTLAND POLICE
DEPARTMENT, EDWARD GOOGINS, KEVIN GERRISH, JEFFREY CALDWELL,
AND TODD BERNARD'S MOTION FOR SUMMARY JUDGMENT AND
INCORPORATED MEMORANDUM OF LAW**

## I. FACTUAL BACKGROUND

Pursuant to Local Rule 56, all the material facts which Defendants contend are

undisputed and which support this motion for summary judgment are set forth in the

accompanying Statement of Material Facts Not In Dispute (SOMF) and a DVD on file with the

Clerk of Court which recorded the traffic stop and use of force, and those are incorporated by

reference herein. For the court's convenience, and to put the below legal arguments in context,

the following is a synopsis of the factual background of this claim.

On July 21, 2005, just before 8:00 p.m., South Portland Police Officers Kevin Gerrish

and Jeffrey Caldwell were out of their vehicles at 331 Sawyer Street in South Portland serving a

warrant. They heard the revving of an engine of a vehicle and observed a red Ford pickup truck

approaching at a high rate of speed. Officer Gerrish estimated the speed of the vehicle to be

approximately 45 mph where the posted speed limit was 30 mph. The vehicle slowed only

slightly as it passed the police cars parked on the side of the road. The vehicle then accelerated

1

up Sawyer Street, at which point Officer Gerrish estimated the vehicle's speed to be well over 50 mph. Officer Gerrish got into his cruiser and attempted to catch up with the vehicle. He lost sight of the vehicle briefly as it crested a hill, but caught up with it at the intersection of Sawyer Street and Mitchell Road and activated his cruiser's blue lights. The vehicle did not immediately pull over. While the right turn signal did come on, the vehicle continued to travel some distance on Sawyer Street. After about 20 seconds, the vehicle finally pulled over and came to a complete stop, partially on the lawn of a private residence. When Officer Gerrish's emergency lights were activated, his dashboard mounted cruiser video system automatically activated and began recording the events of that day involving the driver, later identified as Stephen Parker, and officers of the South Portland Police Department. When this contact ended with the arrest of Stephen Parker, Officer Gerrish removed the video recording from the cruiser and secured it as evidence. A true copy of this recording, in DVD format, has been filed with the office of the clerk of the U.S. District Court for the District of Maine in connection with this motion, and portions of that recording are referenced herein according to the time of day (hr:min:sec format) that was automatically imprinted on the recording. Unfortunately, there is no audio recording of this event, either because the audio equipment was not functioning properly, or was not turned on when the video equipment began recording.

After observing signs of visible intoxication in the vehicle's driver, Plaintiff Stephen Parker, when speaking to him alongside the vehicle, Officer Gerrish asked Plaintiff if he had been drinking. Plaintiff admitted to having had 3 or 4 drinks in the past hours and also admitted that he had been driving 40 mph, but claimed to believe the speed limit was 35 mph, not 30 mph as posted. When Plaintiff attempted to retrieve his driver's license from a backpack in the vehicle, Officer Gerrish observed some beer bottles and a half empty bottle of rum. Based on his

observations and Plaintiff's admissions, Officer Gerrish requested that Plaintiff come to the rear of the vehicle and perform some field sobriety tests. Officer Gerrish performed the horizontal gaze nystagmus test, and asked Plaintiff to recite a portion of the alphabets and a number sequence. Plaintiff failed all three tests. When Officer Gerrish next wanted Plaintiff to perform the one-leg stand test, he had to demonstrate it and explain it to him three separate times. When Plaintiff claimed he had a "bad" right foot due to gout, he was advised to stand on his good, left foot and raise his bad foot in the air. While the HGN testing is difficult to actually observe on the video, and the lack of audio recording to accompany the video does not allow one to follow the alphabet or number sequence tests, Plaintiff's one-leg stand test is clearly shown on the video. Officer Gerrish can be seen demonstrating and explaining the test repeatedly between 7:54:49 and 7:55:42.

As Officer Gerrish began administering the tests, Officer Caldwell had arrived as backup if needed and took up a position some distance away to the right and rear of Officer Gerrish. Officer Caldwell was not close enough to Plaintiff and Officer Gerrish to be captured in the video image until the point Plaintiff was arrested. Nevertheless, Plaintiff, for no rational reason, became fixated on Caldwell's presence, then began swearing at him, making obscene gestures to him and saying that he was not afraid of Officer Caldwell. Plaintiff can be seen engaging in this behavior several times on the video including at 7:53:35 (gesturing toward Caldwell), 7:56:00 (staring at Caldwell while Gerrish tries to maintain his attention for sobriety testing), 7:57:09 (swearing and making and obscene gesture at Caldwell), and 7:57:11 (another obscene gesture and swearing at Caldwell) on the video. At the time Plaintiff began challenging and insulting Officer Caldwell with both words and gestures, Officer Caldwell was merely standing off the street and observing Officer Gerrish's administration of field sobriety tests to Plaintiff.

After hopping on one leg and obviously being unable to successfully complete sobriety testing, Plaintiff stated that Officer Gerrish should just "do what you got to do." Plaintiff then turned his back on Officer Gerrish and placed his hands on his truck. Officer Gerrish had not completed his field sobriety testing and told Plaintiff to turn around so he could ask him one more question. Plaintiff did so, at 7:57:09, but also yelled profanities at Officer Caldwell and made an obscene gesture toward him as he did. Officer Gerrish asked Plaintiff how he would rate himself on a numerical scale with one being not impaired and ten being completely drunk, and Plaintiff rated himself a two, apparently conceding he was impaired at some level. Plaintiff himself has testified that he was concerned about his ability to drive when leaving the marina where he had berthed his boat.

At 7:57:11, Mr. Parker was again facing Officer Gerrish, with his arms crossed in front of his chest. At 7:57:11, Mr. Parker can again be seen giving Officer Caldwell his middle finger and swearing at him. Again, when Plaintiff demonstrated increasing hostility and anger toward Officer Caldwell, Officer Caldwell still was merely standing off to the side acting as backup and observing Officer Gerrish's administration of field sobriety tests. Officer Gerrish advised Plaintiff that he was under arrest and told him to place his hands behind his back for handcuffing. Plaintiff instead crossed his arms tightly across his chest and refused to comply with Officer Gerrish's command. At 7:57:22, after Mr. Parker refused his order to uncross his arms from his chest and place them behind his back for handcuffing, Officer Gerrish stepped forward and tried to physically pull down Plaintiff's arms so that he could handcuff him. Mr. Parker actively resisted Officer Gerrish's physical effort to force compliance with his command, pushing out his chest and tightening his arm muscles so his hands could not be put in a position behind him for handcuffing. Officer Gerrish struggled with Plaintiff for a few seconds but realized Mr. Parker

was not going to submit willingly or easily to being taken into custody. At 7:57:25, Officer Gerrish stepped away from Plaintiff before his struggle to pull Plaintiff's arms down from his chest escalated into a greater physical confrontation between them, as it was threatening to do. At this point, 7:57:25, Officer Caldwell stepped forward to assist Officer Gerrish in trying to take Plaintiff into custody.

At 7:57:28, Officer Gerrish took his Taser unit from his belt, pointed it at Plaintiff, and informed him that if he did not place his hands behind his back and follow his commands, he would be tased. In response Plaintiff instead first put his arms by his side while clenching his fists tightly and flexing his arms, then took his right wrist into his left hand and grasped it very tightly behind his back, while glaring at Officer Caldwell and continuing to direct profanities toward him. This can be seen on the video at 7:57:30-7:57:35, at which point Officer Gerrish handed his handcuffs to Officer Caldwell as he continued to aim his Taser at Mr. Parker. At 7:57:35 Sergeant Bernard, who had just arrived on the scene and while also pointing his Taser at Mr. Parker, approached from across the street to Officer Gerrish's left to provide additional assistance if needed. It appeared to Officer Gerrish that Plaintiff would not submit willingly to being handcuffed and taken into custody, and he was prepared to use his Taser if Plaintiff continued to resist to avoid anyone getting injured. At 7:57:37 Officer Caldwell began to apply the handcuff onto the left wrist of Plaintiff, completing that within a couple seconds. At 7:57:39 Officer Caldwell attempted to complete the handcuffing by having Plaintiff release his grip on his right wrist and allow it to be placed in position to be handcuffed. Officer Gerrish heard Officer Caldwell ordering Mr. Parker to let go of his right wrist, and Gerrish repeated his command to Plaintiff to submit to handcuffing or that he would use the Taser. Mr. Parker did not submit to Officer Caldwell's efforts to handcuff him or comply with the directives he was

given. Officer Gerrish suddenly saw Plaintiff try to pull his right arm forward in an attempt to get out of Officer Caldwell's grasp, and saw Officer Caldwell's body dip forward as if being pulled off balance. This movement that he observed can be seen on the video at 7:57:42-7:57:44, at which point Gerrish deployed the Taser against Mr. Parker. At the moment he deployed the Taser, Officer Gerrish was concerned for Officer Caldwell's safety, as he clearly can be seen struggling to overcome Plaintiff's physical resistance to being handcuffed and being pulled off balance.

At the point Officer Gerrish made the decision to control Plaintiff through the use of his Taser, Mr. Parker had refused his commands to uncross his arms from his chest and put them behind him for handcuffing, and then physically resisted Gerrish's efforts to force him to do that when he refused to do it himself. Gerrish then observed Plaintiff's refusal to obey directives from both him and Officer Caldwell to release his right wrist from his left hand to allow his hands to be put in position for handcuffing, under the threatened use of the Taser if he did not comply. Finally, it appeared to Officer Gerrish that Plaintiff was attempting to pull his right arm free from Officer Caldwell and, had he done so, he could have turned and put himself into position to strike Officer Caldwell. At this time, he also had a metal handcuff attached to one wrist, something that posed an additional threat if any of the officers were struck with it as Plaintiff threw punches.

When he first exited his vehicle, Plaintiff was not hostile or challenging to Officer Gerrish, but after Officer Gerrish denied Plaintiff's request to "cut him a break" because he was only a mile from his home and let him drive off, his demeanor began to change. Even without any accompanying audio, Plaintiff's demeanor and body language can be seen on the video growing ever more hostile and uncooperative until he reaches the point of physically resisting

being handcuffed and taken into custody. At that point, Plaintiff's physical resistance made it apparent to the officers that he was not going to submit voluntarily or readily to being arrested and that the situation would likely deteriorate until an all out physical brawl between this large muscular man and the officers would be necessary before they could control him. Because of this, Officer Gerrish made the decision to deploy his Taser to temporarily incapacitate Plaintiff so he could be safely taken into custody. Plaintiff received medical attention after the Taser was used, in accordance with department policy, and was further transported to Maine Medical Center based on his own subjective complaints. Plaintiff was seen and released from the emergency room there. His blood/alcohol level an hour and a half after the traffic stop was .19, more than twice the legal limit for drivers.

The Taser was adopted as a standard issue tool in 2005 by South Portland Police Chief Edward Googins following research and demonstrations of its ability, including consideration of the experience of other law enforcement agencies which had used it extensively, and after a two year period of testing and evaluation by a core group of South Portland police officers. Of the officers at the scene of Plaintiff's arrest, only Officer Caldwell was not certified at that time to carry and use the Taser at that time, and he did not use one. Before any officer can carry a Taser he/she must attend classroom training, undergo written testing, and demonstrate hands-on proficiency in its use. Most officers also submit to having the Taser used on themselves as part of this training to become familiar with both its ability to temporarily incapacitate and its limitations, as the person against whom it is used has an instantaneous ability to recover and resume resisting as soon as the electrical charge ceases. Before approving the Taser for use by his officers, Chief Googins himself attended the necessary training and volunteered to have it used on him. The Taser provides the officers another tool to enable them to overcome resisting

subjects and force compliance with orders to submit to custody without using impact weapons or having to engage in a physical altercation that poses serious risk of injury to both police officers and the arrestee.

Plaintiff has filed suit claiming that the use of the Taser against him was unlawful and that physical force used after the Taser was deployed also was excessive. These claims against the individual officers Gerrish, Caldwell and Bernard are brought pursuant to 42 U.S.C. § 1983 (Ct. 1), and its state counterpart, the Maine Civil Rights Act (Ct. IV), as well as under state negligence law (Count III). Claims are brought against the City of South Portland, the South Portland Police Department (though it is not a governmental entity with the capacity to sue or be sued, but merely a department of such a governmental entity), and Chief Googins alleging a failure to properly train, supervise and discipline South Portland police officers in the use of force and for failing to adopt adequate procedures or practices to ensure compliance with the Constitution regarding use of force generally, and the Taser, specifically. This is alleged to be a "violation of 42 U.S.C. § 1983" and unspecified Constitutional rights (Ct. II). Defendants contend that there was no violation of Plaintiff's Constitutional or state tort law rights to be free from unreasonable force, and/or that they are immune from such claims under the facts of this case and applicable law. The municipal Defendants contend that they are not liable because there was no violation of Plaintiff's rights by the individual officers and, in the alternative, there was no deliberate indifference to the need for training, supervision or disciplining of employees and/or no failure to adopt adequate policies and practices to ensure lawful uses of force by municipal police officers.

## II. LEGAL ARGUMENT

### A. EXCESSIVE FORCE CLAIMS AGAINST THE INDIVIDUAL POLICE OFFICER DEFENDANTS IN COUNTS I AND IV

Plaintiff's Complaint, at Counts I and IV, while not articulating the specific legal basis for his excessive force claim, appears to state a claim for violations of the Fourth Amendment to the U.S. Constitution and its state counterpart. The Maine Civil Rights Act was patterned after 42 U.S.C. § 1983, and courts determining rights under the state constitutional standards have employed the same qualified immunity analysis as is used under the U.S. Constitution. *See Grenier v. Kennebec County*, 733 F. Supp. 455, 458 n.6 (D. Me. 1990); *Jenness v. Nickerson*, 637 A.2d 1152, 1155 (Me. 1994). As a result, the arguments raised herein to the federal law claims apply equally to claims brought under the parallel state constitutional provisions. *Comfort v. Pittsfield*, 924 F. Supp. 1219 (D. Me. 1996).

Defendants contend that it is clear that probable cause existed on July 20, 2005 to allow police to lawfully arrest Plaintiff. Plaintiff's Complaint, in fact, does not mention his arrest as a basis for his claim at all. As long as police had a right to arrest Plaintiff they also were entitled to use reasonable force to overcome any resistance to being taken into custody. While denying that Plaintiff has adequately pled any action arising out of Officer Gerrish's decision to arrest him, Defendants nevertheless can establish that Officer Gerrish made a lawful arrest of Plaintiff and therefore was entitled to use a reasonable degree of force to effect it. *Graham v. Connor*, 490 U.S. 386 (1989). Defendants contend that Officer Gerrish's use of the Taser was a reasonable degree of force necessary to control Plaintiff and to take him into custody, and that any force used was required by Plaintiff's own actions, including refusal to obey officers' lawful orders to him and then physically resisting being taken into custody. The only force used against

Plaintiff after the Taser was used was a reasonable amount needed to hold him down on the ground, to stop him from spitting on the officers, and to allow handcuffs to be placed on this large, muscular, intoxicated and physically resisting subject. Any physical injury which Plaintiff attributes to being incapacitated by the Taser and handcuffed, was caused by his own refusal to submit to arrest and, if suffered in this encounter, were not intentionally inflicted by Defendants. Defendants cannot be subject to liability for excessive force under the Fourth Amendment or its state counterpart based on negligent, rather than intentional, conduct. *Brower v. Inyo County*, 489 U.S. 593 (1989); *Landrigan v. City of Warwick*, 628 F.2d 736 (1st Cir. 1980). Based on the uncontroverted facts, Officer Gerrish is entitled to summary judgment under Counts I and IV because he did not intentionally act to deprive Plaintiff of his right to be free from excessive force by deploying the Taser against him and subjecting him to five seconds of incapacitating electrical charges to allow the other officers present to get physical control of Plaintiff who was then under arrest. Defendants Bernard and Caldwell are also entitled to summary judgment as to those counts because the only force they used was a reasonable amount necessary to allow them to take Plaintiff into custody, in the face of his continued physical resistance.

In the alternative, Defendants Bernard and Caldwell contend that they are entitled to qualified immunity because a reasonable police officer, when viewed objectively, could have concluded that holding Plaintiff down on the ground and handcuffing him in order to overcome his resistance would be lawful under the circumstances. Likewise, Officer Gerrish did not violate any clearly established law that would make Taser use under these circumstances unlawful. In making a split-second judgment about the need to use physical force Defendants were not required to achieve control over Plaintiff through the use of the least intrusive or forceful means of doing so to preserve their immunity under the Fourth Amendment. *Saucier v.*

*Katz*, 53 U.S. 194 (2001); *see also Illinois v. Lafayette*, 462 U.S. 640 (1983); *United States v. Martinez-Fuerte,* 428 U.S. 543 (1976). It is enough if an objectively reasonable police officer would deem such action reasonable at that moment. *Graham v. Connor*, 490 U.S. 386 (1989).

Defendants contend there is no clearly established law prohibiting the use of the Taser in the face of a hostile arrestee, who has ignored officer presence, verbal commands, and hands-on contact and who had refused to comply with orders to submit and then physically resisted police attempts to take him into lawful custody. Defendants have not located any definitive case law regarding the use of the Taser either in this Court or the First Circuit Court of Appeals in effect on July 20, 2005 that would have made the unlawfulness of the use of the Taser in this situation "apparent" on that date. Conversely, there is ample case law to support the defense that the use of a Taser to temporarily incapacitate a resisting subject is reasonable, given that other alternatives to overcome resistance, such as physically overpowering the arrestee, using a baton or other impact weapon, or using chemical agents all carry their own risks to both the officers and the arrestee. *See, e.g., Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004); *Russo v. City of Cincinnati*, 953 F.3d 1036, 1044-45 (6th Cir. 1994). The proper use of a Taser requires neither close proximity to the arrestee nor carries any serious risk of lasting injury to him. *Wylie v. Overby*, 2006 U.S. Dist. LEXIS 29845 at 21 (D. Mich. 2006), *citing Nicholson v. Kent County Sheriff's Dept.*, 839 F. Supp. 508, 515 n.4 (W.D. Mich. 1993). In *Draper*, the court found the use of a Taser reasonable in a traffic stop involving a subject who was hostile, belligerent and uncooperative, refusing to obey officer commands, yelling profanities at the officer and appearing agitated. The court noted that the use of the Taser prevented a physical struggle that held a risk for serious injury to either the plaintiff or the arresting officer and therefore, under the totality of the circumstances, the officer's use of the Taser did not constitute excessive force. *See*

*also Wylie,* and the court's discussion on the limited options available to police to subdue a physically resisting subject and the risks attendant with each and finding the Taser a reasonable alternative to physical force, batons or chemical agents. *See also DeVoe v. Rebant*, 2006 U.S. Dist. LEXIS 5326 (D. Mich. 2006)(also finding use of a Taser reasonable to deal with a hostile and uncooperative arrestee in a traffic stop situation).

As to a state law excessive force claim, the standard is subjective, rather than objective, reasonableness and an officer is immune unless he uses a degree of force that he believes is unnecessary. *Leach v. Betters*, 599 A.2d 424 (Me. 1991). The officers clearly used a degree of force that they felt was necessary to overcome Plaintiff's resistance to being handcuffed and taken into custody following a lawful arrest.

To the extent Plaintiff seeks to impose liability on the part of Officers Bernard and Caldwell for failing to intervene to stop the Taser deployment by Officer Gerrish, Defendants contend that no such claim is raised in Plaintiff's Complaint, which only alleges the direct use of excessive force by these officers against Plaintiff. Defendants Bernard and Caldwell are entitled to summary judgment on that basis alone. To the extent the court feels such a theory of recovery is implicated by the Complaint, however, Defendants will address that issue here, though they do not accept any such reading of the Complaint. "An officer who is present at the scene and fails to take reasonable steps to protect the victim of another officer's excessive force can be held liable under section 1983 for his nonfeasance." *Gaudreault v. Municipality of Salem*, 923 F2d 203, 207 n. 3 (1st Cir. 1990). Such liability cannot be imposed however, when the force in question is only seconds in duration and the non-involved officers have "'no realistic opportunity' to prevent" it. *Id., citing O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988); *see also Torres-Rivera v. O'Neill-Cancel*, 406 F.3d 43 (1st Cir. 2005). In the instant case it is

uncontroverted that Officers Bernard and Caldwell were not in a position to intervene to prevent the use of the Taser by Officer Gerrish, who made a split-second decision to deploy it. To the extent Plaintiff's Complaint can be read to assert liability against Officers Bernard and Caldwell for failing to intervene, something Defendants deny occurred or has even been pled, they are still entitled to summary judgment under the facts of this case and prevailing case law.

As to the bald assertion in Plaintiff's Complaint that he was assaulted violently while on the ground after the Taser was used, *see* Complaint at ¶ 25, Plaintiff's own testimony under oath was only that fell to the ground with his head on a grassy lawn, and the only force used after the Taser was that used to hold his him down on this grass while the officers completed handcuffing him. This force, like the use of the Taser initially, again was all occasioned by Plaintiff's own refusal to submit to lawful arrest and physically resisting efforts to handcuff him without incident. Under the totality of the circumstances, holding Plaintiff on the ground so he could finally be handcuffed did not violate clearly established law and also did not violate Plaintiff's state or federal constitutional rights. To the extent Plaintiff asserts any claim against Chief Googins in his individual capacity, arising out of his actions in adopting policies and training and supervising employees, he is entitled to the same qualified immunity defense, as his conduct did not violate any clearly established law. No clearly established law prohibits the adoption of the Taser by police administrators as an alternative non-deadly force tool for use by their officers after proper training and certification, nor has the use of these devices themselves to temporarily incapacitate a resisting arrestee been clearly established as a violation of federally secured rights to be free from the use of unreasonable force, as discussed in the case law noted above.

B. STATE LAW NEGLIGENCE CLAIMS IN COUNT III

Any state law claim based on an alleged use of force is subject to the absolute immunity provisions of the Maine Tort Claims Act. Section 8111(1)(C) of the Act affords absolute immunity to governmental employees for "[p]erforming or failing to perform any discretionary function or duty, whether or not the discretion is abused; and whether or not any statute, charter, ordinance, order, resolution, rule or resolve under which the discretionary function or duty is performed is valid." 14 M.R.S.A. § 8111(1)(C). For purposes of the MTCA, "[a] law enforcement official's use of force is a discretionary act." *Comfort v. Pittsfield*, 924 F. Supp. 1219 (D. Me. 1996). Here, the record also contains no "hint of ill will, bad faith, or improper motive." *Leach v. Betters,* 599 A.2d at 426. Indeed, Defendant Gerrish showed much patience in trying to convince Plaintiff to submit to custody without the need for force to be used against him, including ordering him to submit repeatedly, physically trying to uncross his arms to compel Plaintiff's compliance when he refused an order to do so, and threatening to use the Taser both verbally and by openly aiming it while asking Officer Caldwell to take over the effort to handcuff Plaintiff. Officer Caldwell likewise attempted to handcuff Plaintiff without incident, but was unable to because Plaintiff also refused his commands to unlock his hands so they could be cuffed and physically resisted Officer Caldwell's efforts to pry them apart. It was only when all those efforts failed that Officer Gerrish felt compelled to deploy the Taser out of concern for the safety of Officer Caldwell as Plaintiff continued to resist handcuffing. Sgt. Bernard's involvement was observing the situation until the Taser was deployed and then merely holding Plaintiff to the ground while Officer Caldwell completed the application of handcuffs.

Defendants contend that any use of force claim based on state law, including negligence, is subject to their immunity under the MTCA, as are any damages allegedly caused by their

negligent conduct. In the absence of any bad faith or conduct so egregious as to vitiate their immunity, Defendants are immune from such claims, even if based on intentional, rather than merely negligent, acts. *See* § 8111(1)(E).

## C. MUNICIPAL LIABILITY CLAIMS IN COUNT II

Plaintiff has alleged municipal liability claims against the City of South Portland, the South Portland Police Department, and Chief of Police Edward Googins. *See* Complaint at Ct. II. The allegations include an alleged failure to train, supervise and discipline employees, *see* ¶ 33, and the adoption of unconstitutional policies, practices and procedures regarding the use of force generally and the Taser, specifically. *Id.* at ¶ 34. Governmental entities are not vicariously liable for the acts of their employees for claims brought pursuant to 42 U.S.C. § 1983. *Hayden v. Grayson*, 134 F.3d 449, 456 (1st Cir.), *cert. den.* 118 S.Ct. 2370 (1998). Governmental entities can be held liable under section 1983 for constitutional violations committed pursuant to an unconstitutional custom, policy or practice, *Monell v. New York City Department of Social Services*, 436 U.S. 658, 690 (1978), but such liability exists "only where [the entity] *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under §1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original). "This requires that the plaintiff demonstrate both the existence of a policy or custom and a causal link between that policy and the constitutional harm." *Santiago v. Fenton*, 891 F.2d 373, 381 (1st Cir. 1989). At the outset, Defendants contend that the South Portland Police Department is not an appropriate entity for a municipal liability claim. Claims against governmental entities are suits against the inhabitants of the governmental entity, even if based on the actions of a final policymaker such as the chief of police for the adoption of policies or supervision of employees. *See Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986); *Faucher v. City of Auburn*, 465 A.2d

1120 (Me. 1983)(changing a suit against the city's school department into a suit against the city because the city, and not a department of the city, is the proper party in suits of this type); *see also* 14 M.R.S.A. § 8102(2) & (3), defining "governmental entity" and "political subdivision" as a matter of state law.  To the extent the claim seeks to assert liability against the city, its police department or the chief of police in his official capacity, they are all liability claims against the municipality. As to the use of force aspect of the claim, the single decision of the final policymaker in this case, Chief Googins, to adopt the Taser as standard equipment with required training and certification, must be sufficient to trigger § 1983 liability.  *Pembaur,* 474 U.S. at 482-83; *see also Bryan County v. Brown,* 520 U.S. 397, 400 (1997).  As to the failure to train or supervise aspect of the municipal claim, this may only serve as a basis for § 1983 liability where the conduct "amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *Canton v. Harris*, 489 U.S. at 387-88 (1989).  A claim based on a hiring decision must prove that the final policymaker intentionally deprived Plaintiff of a federally protected right, and that there is as a direct causal link between the intentional action and the deprivation alleged. *Bryan County v. Brown*, 520 U.S. at 404-05.  In the affidavit of Chief Googins filed in support of the accompanying Statement of Material Facts Not In Dispute, the chief of police provides statistical evidence concerning the actual history of the use of South Portland police officers for the three year period preceding Plaintiff's arrest in 2005.  That data clearly demonstrates there was no information that would have put the municipality on notice of any problem with the use of force generally, or the Taser specifically, prior to Plaintiff's arrest in 2005, which could give rise to a charge of deliberate indifference.  The Taser had been thoroughly investigated before its adoption, both through research of its history with other agencies that had adopted it already, and also a two year trial period of field use by a core group

of South Portland officers prior to its adoption in 2005. The record is devoid of evidence of any unconstitutional custom, policy or practice of deliberate indifference to the supervision or training of personnel, specifically regarding arrests and/or the lawful use of force in connection with arrests. Officer Gerrish was not allowed to carry a Taser until he had received classroom training, written testing, demonstrated hands-on proficiency and been certified to carry it. Defendants would also note that the instant claim is the first complaint arising out of a Taser use in South Portland, and nothing in the developing case law around the country has established that its use by police is, *per se*, an unconstitutional practice. Defendants contend that the undisputed facts demonstrate conclusively that the South Portland police officers involved in Plaintiff's arrest and any accompanying use of force in this case have received appropriate training, including training regarding the lawful use of force in connection with arrests and specifically the lawful use of the Taser. The police department also has adopted a specific policy regarding the lawful use of force, a policy that is also specifically regulated by state statute.

Even if Plaintiffs *could* prove inadequate training in arrests and/or the use of force, their claim against the town and police department would fail because they are missing an essential element of a constitutional claim: *a causal connection*. Plaintiffs cannot show "both the existence of a policy or custom and a causal link between that policy and the constitutional harm." *Santiago v. Fenton*, 891 F.2d 373, 381 (1st Cir. 1989). With respect to any failure to train theory, such claims are typically analyzed against the Supreme Court's decision in *City of Canton v. Harris*, 489 U.S. 378 (1989). The *Canton* court held that "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for [municipal] liability under § 1983." *Id.* at 387. "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights

of persons with whom the police come into contact." *Id*. at 388. This is a variant of the *Monell* principle regarding unconstitutional customs, policies and practices. *Id*. at 389. In *Canton*, the court wrote:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."

*Id*. at 390.

Under such circumstances, a governmental entity may be held liable if the failure to train actually causes injury. *Id*. But, for plaintiffs making such allegations, *Canton* imposes a standard of liability that is not easily overcome. The fact "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city." 489 U.S. at 390. "[P]lainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." *Id*. at 391. There is no evidence in this case that training deficiencies were "closely related to the ultimate injury." *Id.*

In *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978) the Supreme Court held:

> [municipalities] can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

*Id*. at 690-91.  Under *Monell,* the custom or policy must have *caused* the constitutional

deprivation.  *Id*. at 692.  Evidence of a single incident is ordinarily insufficient to establish a

custom or policy.  *St. Hilaire v. City of Laconia*, 71 F.3d 20, 29 (1st Cir. 1995).  In the instant

case, there is no evidence whatsoever of an *approved policy* of the South Portland Police

Department that was the "moving force," *Monell*, 436 U.S. at 694, behind any constitutional

deprivations alleged in the Complaint, whether grounded in hiring, training, supervision or

adoption of standard issue equipment.

The outcome must be the same under the *custom* prong of *Monell*.  In the First Circuit, a

plaintiff must satisfy two requirements to maintain a section 1983 action based on an

unconstitutional municipal custom or practice:

> First, the custom or practice must be attributable to the municipality.  In other words, it
> must be so well-settled and widespread that the policymaking officials of the municipality
> can be said to have either actual or constructive knowledge of it yet did nothing to end the
> practice.  Second, the custom must have been the cause of and the moving force behind
> the deprivation of constitutional rights.

*Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989) (citations omitted).  In *Bordanaro*,

there was uncontroverted evidence that the police department had a "longstanding, wide-spread,

and facially unconstitutional practice of breaking down doors without a warrant when arresting a

felon."  *Id*.  This practice was attributed to the municipality through the constructive knowledge

of its chief of police, due to the widespread nature of the practice, as well as an internal review

process that alerted him to practices that violated department policy.  *Id*. at 1157.  In *Bordanaro*

the officers' conduct followed a *regular police practice* that established the "affirmative link"

between the impermissible practices and the constitutional deprivation.  *Id*. at 1158.  The

Plaintiff in this case has no evidence of the kind of persistent, widespread, permanent and well-

settled custom or usage contemplated by *Monell* regarding the unlawful use of force by South

Portland officers, nor has he even alleged any. *See* 436 U.S. at 691; *see also* Complaint at Count II. Defendants contend that no theory of municipal liability exists that would support liability against the City of South Portland, the South Portland Police Department, or Chief of Police Edward Googins and they are entitled to summary judgment as to any so-called official capacity or municipal claims based on federal or state Constitutional law.

### III. CONCLUSION

Based on the above arguments, and on the undisputed factual record found in the accompanying Statement of Material Facts Not In Dispute, Defendants City of South Portland, South Portland Police Department, Edward Googins, Kevin Gerrish, Jeffrey Caldwell and Todd Bernard respectfully request this Court issue an Order granting summary judgment in their favor as to all counts of Plaintiff's Complaint against them.

Dated at Portland, Maine this 12th day of February, 2007.

*/s/Edward R. Benjamin, Jr., Esq.*
Edward R. Benjamin, Jr., Esq.
Attorney for Defendants City of South
Portland, South Portland Police Department,
Edward Googins, Kevin Gerrish, Jeffrey
Caldwell, and Todd Bernard

Thompson & Bowie, LLP
Three Canal Plaza
Portland, ME 04112
(207) 774-2500
ebenjamin@thompsonbowie.com

CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2007 I electronically filed Defendants City of South Portland, South Portland Police Department, Edward Googins, Kevin Gerrish, Jeffrey Caldwell and Todd Bernard's Motion for Summary Judgment and Incorporated Memorandum of Law with the Clerk of the Court using the CM/ECF system which will send notification of such filings(s) to the following: Benjamin Gideon, Esq.

_/s/Edward R. Benjamin, Jr., Esq._
Thompson & Bowie, LLP
Three Canal Plaza
Portland, ME 04112
(207) 774-2500
ebenjamin@thompsonbowie.com