*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *STEPHEN PARKER* | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | *Civil No. 06-129-P-S* |
| | ) | |
| *CITY OF SOUTH PORTLAND, et al.,* | ) | |
| | ) | |
| *Defendants* | ) | |

*RECOMMENDED DECISION ON DEFENDANTS'*
*MOTION FOR SUMMARY JUDGMENT*

In this action arising from the use of an electronic stun gun during the July 20, 2005 arrest of plaintiff Stephen Parker, the defendants (the City of South Portland ("South Portland"), the South Portland Police Department ("SPPD"), Edward Googins, Kevin Gerrish, Jeffrey Caldwell and Todd Bernard) move for summary judgment as to all counts against them. *See* Defendants City of South Portland, South Portland Police Department, Edward Googins, Kevin Gerrish, Jeffrey Caldwell and Todd Bernard's Motion for Summary Judgment, etc. ("Defendants' S/J Motion") (Docket No. 13) at 20; *see also* Complaint and Demand for Jury Trial ("Complaint") (Docket No. 1). For the reasons that follow, I recommend that the motion be granted in part and denied in part.

## I. Summary Judgment Standards

### A. Federal Rule of Civil Procedure 56

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute

over it is resolved favorably to the nonmovant.  By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'"  *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  *Santoni,* 369 F.3d at 598.  Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e).  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party."  *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

### B.  Local Rule 56

The evidence the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the Local Rules of this District.  *See* Loc. R. 56.  The moving party must first file a statement of material facts that it claims are not in dispute.  *See* Loc. R. 56(b).  Each fact must be set forth in a numbered paragraph and supported by a specific record citation.  *See id*.  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each

numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial or qualification with an appropriate record citation. *See id*. The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id*. The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id*.

Failure to comply with Local Rule 56 can result in serious consequences. "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(e). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id*.; *see also, e.g., Cosme-Rosado v. Serrano-Rodriguez*, 360 F.3d 42, 45 (1st Cir. 2004) ("We have consistently upheld the enforcement of [Puerto Rico's similar local] rule, noting repeatedly that parties ignore it at their peril and that failure to present a statement of disputed facts, embroidered with specific citations to the record, justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted.") (citations and internal punctuation omitted).

## II. Factual Context

The parties' statements of material facts, credited to the extent either admitted or supported by record citations in accordance with Local Rule 56 and viewed in the light most favorable to Parker as nonmovant, reveal the following relevant to this recommended decision:[1]

Stephen Parker is a career merchant mariner with twenty-six years' experience working as a merchant marine. Plaintiff's Statement of Additional Material Facts ("Plaintiff's Additional SMF"), commencing at page 29 of Plaintiff's Statement of Opposing and Additional Material Facts ("Plaintiff's Opposing SMF") (Docket No. 20) ¶ 1; Defendants City of South Portland, South Portland Police Department, Edward Googins, Kevin Gerrish, Jeffrey Caldwell, and Todd Bernard's Response to Plaintiff's Statement of Additional Material Facts ("Defendants' Reply SMF") (Docket No. 25) ¶ 1. He works as the chief steward on board marine vessels, in charge of a crew and responsible for all of the supplies used by the ship during its voyage. *Id*. ¶ 2.

At all relevant times, Edward Googins was employed as the chief of police for the SPPD, a position he has held for more than twelve years. Defendants City of South Portland, South Portland Police Department, Edward Googins, Kevin Gerrish, Jeffrey Caldwell, and Todd Bernard's Statement of Material Facts ("Defendants' SMF") (Docket No. 14) ¶ 175; Plaintiff's Opposing SMF ¶ 175. Prior to becoming South Portland's police chief, Googins was employed by the City of Portland Police Department, having been hired as a patrol officer in 1974 and having retired from that agency with the rank of captain in 1994. *Id*. ¶ 176. As South Portland's chief of police, Googins has final policymaking authority with regard to adoption of departmental policies and standard operating procedures governing the conduct of South Portland police officers. *Id*. ¶ 177.

---

[1] As noted above, Local Rule 56 requires a party responding to a statement of material facts to admit, deny or qualify the underlying statement. *See* Loc. R. 56(c)-(d). The concept of "qualification" presupposes that the underlying statement is accurate but in some manner incomplete, perhaps even misleading, in the absence of additional information. Except to the extent that a party, in qualifying a (*continued on next page*)

At all relevant times, Kevin Gerrish was employed as a patrol officer with the SPPD, having been hired by that agency in November 2001. *Id*. ¶ 1. Prior to November 2001, Gerrish was a juvenile corrections officer at the Maine Youth Center. *Id*. ¶ 2. Gerrish graduated from the Maine Criminal Justice Academy ("Justice Academy") in June 2002. *Id*. ¶ 3. Both at the Justice Academy and at the SPPD Gerrish has received training in the lawful use of force in connection with arrests, including all weapons he is issued. *Id*. ¶ 4. The weapons Gerrish is issued by the SPPD include firearms, pepper spray ("OC"), a collapsible baton and a Taser. *Id*. ¶ 5.

Electronic guns have been available since the mid-1970s but have not been widely used in the law-enforcement community until recently. Plaintiff's Additional SMF ¶ 129; Defendants' Reply SMF ¶ 129. The Taser is one brand of electronic gun, distributed and marketed by Taser International. *Id*. The Taser is a hand-held electronic gun that fires two barbed darts up to a distance of twenty-one feet. *Id*. ¶ 130. The darts remain connected to the gun by wires. *Id*. The fish-hook-like darts are designed to penetrate up to two inches into the target's clothing or skin and deliver a 50,000-volt shock. *Id*. The shock overrides the body's central nervous system, causing total incapacitation of the body's muscles and instant collapse. *Id*. On the use-of-force continuum, the Taser falls in the highest category of force, just one step down from the use of deadly force. *Id*. ¶ 141. The Taser causes temporary incapacitation and the inability to catch oneself, which can result in a dangerous or even fatal fall. *Id*. ¶ 142. The Taser can cause severe muscle contractions that may result in injuries to muscles, tendons, ligaments, backs and joints and stress fractures. *Id*. ¶ 144. In a number of cases, individuals have died in custody after being Tased. *Id*. ¶ 145.[2]

---

statement, has expressly controverted all or a portion of the underlying statement, I have deemed it admitted.

[2] I omit paragraphs 131-33, 135-37 and 139 of the Plaintiff's Additional SMF, bearing on Taser usage, which are supported by references to an American Civil Liberties Union ("ACLU") report attached to an affidavit of the plaintiff's counsel and/or to an Amnesty International report attached to an affidavit of the plaintiff's expert, John Ryan. *See* Plaintiff's Additional SMF ¶¶ 131-33, 135-37, 139; Mark Schlosberg, *Stun Gun Fallacy: How the Lack of Taser Regulation Endangers Lives*, Am. Civ. Liberties Union of N. Cal. (Sept. 2005), Exh. 1 to Affidavit of Benjamin R. Gideon, Esquire ("Gideon Aff."), attached to Memorandum in (*continued on next page*)

In 2003, after a period of review and study of Taser technology, including the history of its use with other law-enforcement agencies, Googins decided to equip a core group of South Portland's officers with the Taser as an alternative tool for use in situations requiring the use of non-deadly force. Defendants' SMF ¶ 190; Plaintiff's Opposing SMF ¶ 190. The purpose was to evaluate the Taser for possible adoption as standard equipment. *Id.* The SPPD first began using Tasers that year, when the department acquired one Taser gun. Plaintiff's Additional SMF ¶ 151; Defendants' Reply SMF ¶ 151. The department phased in use of Tasers over the course of 2004 and 2005. *Id.* ¶ 152.

No South Portland officer may carry or use a Taser unless he or she is certified to do so after undergoing training that includes classroom training, written testing and demonstrated hands-on proficiency with the device. Defendants' SMF ¶ 192; Plaintiff's Opposing SMF ¶ 192. Generally, most officers who undergo such training also submit to having the Taser used against them so that they can become intimately familiar with its ability to incapacitate a resistant arrestee temporarily. *Id.* ¶ 193. Googins has personally undergone the Taser training given to all South Portland police officers and has submitted to the use of a Taser to incapacitate him. *Id.* ¶ 194. Use of the Taser against the officers themselves is intended to familiarize them not only with its ability to incapacitate arrestees

Opposition to Summary Judgment ("Plaintiff's S/J Opposition") (Docket No. 21); *Excessive and lethal force? Amnesty International's concerns about deaths and ill-treatment involving police use of tasers*, available at http://web.amnesty.org/library, Exh. 2 to Affidavit of John Ryan ("Ryan Aff."), attached to Plaintiff's S/J Opposition. As the defendants point out, the Amnesty International report is hearsay, *see* Defendants' Reply SMF ¶¶ 135-37, 139, and the plaintiff offers no basis on which it would be admissible pursuant to an exception to the hearsay rule. The defendants do not object to the ACLU report on hearsay grounds; however, they do argue, and I agree, that (i) to the extent the plaintiff cites the ACLU report to highlight deaths from Tasers it is irrelevant, inasmuch as he did not die, *see* Defendants' Reply SMF ¶¶ 131-33, and (ii) the September 2005 ACLU report postdates the events in question and, therefore, its conclusions and admonitions cannot properly form a yardstick against which to measure their conduct, *see* Defendants' Reply Memorandum in Support of Motion for Summary Judgment ("Defendants' S/J Reply") (Docket No. 24) at 2-3; *see also, e.g., Scarver v. Litscher*, 434 F.3d 972, 975-76 (7th Cir. 2006) (observing that some of literature on effect of prison conditions on mental illnesses "postdates Scarver's detention in the Supermax and thus is irrelevant to what the defendants knew when he was there"). I also omit paragraphs 134 and 140, *see* Plaintiff's Additional SMF ¶¶ 134, 140, sustaining the defendants' objections that they are not supported by the citations given, *see* Defendants' Reply SMF ¶¶ 134, 140, and paragraph 138, *see* Plaintiff's Additional SMF ¶ 138, sustaining the defendants' objection that it is irrelevant inasmuch as the policy and training guidelines cited were issued subsequent to the Parker arrest, *see* Defendants' Reply SMF ¶ 138; Defendants' S/J Reply at 3; *PERF Conducted Energy Device Policy and Training Guidelines for Consideration*, PERF Ctr. on Force & Accountability (Oct. 25, 2005), Exh. 2 to Gideon Aff.

temporarily but also with its limitations, inasmuch as a person against whom it is used has an instantaneous ability to recover and resume resisting arrest once the electrical charge is stopped. *Id.* ¶ 195.

South Portland police officers are equipped not only with Tasers but also with OC, or hot pepper spray, and a collapsible metal baton, each of which might also be used to overcome the physical resistance of an arrestee to being taken into custody. *Id.* ¶ 197. In any given situation, one of these tools might be preferable to another, but they all fall within the general category of so-called "less than lethal" tools that allow an officer to exert physical control over a person who is resisting being taken into lawful custody. *Id.* ¶ 198. It is impossible to guarantee that the use of any of these tools will not result in injury to someone, but Googins believed, in adopting the Taser for his department, that it might allow police officers to take a resisting person into custody with less risk of injury than a physical confrontation normally entails. *Id.* ¶ 200.[3]

Gerrish was certified for carrying and using a Taser in May 2005. *Id.* ¶ 6. The Taser certification process included classroom training, written testing and demonstration of hands-on proficiency with the Taser. *Id.* ¶ 7. Gerrish also subjected himself to being Tased so that he could fully appreciate both the Taser's ability to incapacitate a person temporarily and its limitations. *Id.* This training, less than three months before the incident in issue in this case, was the first and only training Gerrish received in the use of Tasers. Plaintiff's Additional SMF ¶ 153; Defendants' Reply SMF ¶ 153. The training, which was completed in less than a day, addressed how to use the Taser weapon – "both its ability to incapacitate and limitations" – but did not touch on the circumstances in which it was appropriate to use the weapon. *Id.* ¶ 154. At the end of the course, Gerrish took a written examination. *Id.* ¶ 156. Not a single question on the examination related to the circumstances

---

[3] The plaintiff qualifies this statement, *see* Plaintiff's Opposing SMF ¶ 200, but the essence of his qualification is set forth elsewhere in (*continued on next page*)

in which the use of a Taser would be appropriate or what kind of conduct or threat justified a Taser response. *Id*. It is also clear from the PowerPoint slides used in connection with the Taser training that it did not address the issue of the circumstances in which use of Taser force would be considered appropriate. *Id*. ¶ 157.[4]

At all relevant times, Jeffrey Caldwell was employed as a police officer with the SPPD. Defendants' SMF ¶ 8; Plaintiff's Opposing SMF ¶ 8. He was hired by the SPPD in November 1987 as a patrol officer and, in August 2004, was assigned to the Selective Enforcement Unit, where his job duties mainly involved serving warrants and assisting patrol officers in necessary followup investigations. *Id*. ¶ 9. Caldwell graduated from the Justice Academy in March 1988. *Id*. ¶ 10. Both at the Justice Academy and at the SPPD he received training in the lawful use of force in connection with arrests. *Id*. ¶ 11.

At all relevant times, Todd Bernard was employed as a police officer with the SPPD. *Id*. ¶ 14. Bernard has been a South Portland police officer for approximately seventeen years. *Id*. ¶ 15. From 1990 to 2005 he held the rank of sergeant, responding to the scene of Parker's arrest on July 20, 2005 as a patrol sergeant who was the immediate supervisor of the arresting officer, Gerrish. *Id*. ¶ 16. In 2005 Bernard was promoted to the rank of lieutenant. *Id*. ¶ 17. Bernard graduated from the Justice Academy in 1990 and has attended numerous courses of instruction since then. *Id*. ¶ 19. Both at the Justice Academy and at the SPPD Bernard has received training in the lawful use of force in connection with arrests. *Id*. ¶ 20. Bernard also has received regular training regarding the SPPD's use-of-force policy, including the use-of-force policy that was in effect on July 20, 2005. *Id*. ¶ 21.

_____

this recitation of facts, *see* Plaintiff's Additional SMF ¶ 193.

[4] I omit the plaintiff's further statement that "[t]hus, prior to being issued the Taser, Gerrish received no training on when it was appropriate to use it[,]" Plaintiff's Additional SMF ¶ 158, which the defendants deny, *see* Defendants' Reply SMF ¶ 158, and which is not fairly supported by the citation given, which is only to materials provided during Gerrish's Taser training, *see* Plaintiff's Additional SMF ¶ 158. The plaintiff elsewhere admits that Gerrish received training at the Justice Academy and the SPPD "in the lawful use of force in connection with arrests, including all weapons he is issued[,]" Defendants' SMF ¶ 4; Plaintiff's Opposing SMF ¶ 4, and that (*continued on next page*)

Bernard is the officer in charge of the SPPD's Special Reaction Team and, on July 20, 2005, was the head of the department's firearms-training program. *Id.* ¶ 22. As of July 20, 2005 Bernard also served on the SPPD's Use of Force Review Board ("Force Review Board"). *Id.* ¶ 23. Any officer using physical force beyond an unresisted handcuffing is required to file a use-of-force report. *Id.* ¶ 24. Use-of-force reports are reviewed by an officer's shift commander at the end of his shift and then are submitted for review by the Force Review Board to ensure that the force used was compliant with law and departmental policy. *Id.* ¶ 25.

In 2003 Bernard became certified as a Taser user when the SPPD made the decision to have a core group of officers evaluate the Taser in the field. *Id.* ¶ 26. Bernard's Taser training included classroom training, a written test, demonstration of proficiency in the use of the device and submission to the use of a Taser against him so that he could be familiar with its effectiveness in temporarily incapacitating a person to overcome resistance to being taken into custody. *Id.* ¶ 27.

All officers employed by the SPPD receive training in the lawful use of force in connection with arrests during their training at the Justice Academy. *Id.* ¶ 178. Use-of-force training also is provided at the SPPD, including periodic review of the department's use-of-force policy. *Id.* ¶ 179. As of July 20, 2005 Gerrish, Caldwell and Bernard all were fully certified by the State of Maine to function as law-enforcement officers within the state. *Id.* ¶¶ 12-13, 18.[5]

On July 20, 2005 Parker drove away from the Spacia Marina even though he was concerned about whether he was in any condition to drive. *Id.* ¶ 28. Just before 8 p.m., Caldwell and Gerrish were out of their vehicles at 331 Sawyer Street in South Portland serving a warrant when Gerrish heard the revving of an engine, and Caldwell and Gerrish observed a red Ford pickup truck

---

the weapons issued to him include a Taser, *see id.* ¶ 5.
[5] In this and other instances, the defendants sometimes state that Parker's arrest occurred on July 21, 2005; however, underlying record materials indicate it occurred on July 20, 2005. *See, e.g.*, Deposition of Stephen Parker ("Parker Dep."), attached to (*continued on next page*)

approaching.  *Id.* ¶ 29.  The pickup truck was traveling at a high rate of speed, which Gerrish estimated to be approximately 45 miles per hour in an area in which the posted speed limit was 30 miles per hour.  *Id.* ¶ 30.  Caldwell also observed the truck traveling well over the posted speed limit as it passed the officers.  *Id.* ¶ 31.  The vehicle slowed only slightly as it passed Gerrish's cruiser, which was parked on the side of the road, and then accelerated up Sawyer Street, at which time Gerrish estimated its speed to be well over 50 miles per hour.  *Id.* ¶ 32.  Gerrish got into his cruiser and attempted to catch up with the vehicle.  *Id.* ¶ 33.  He lost sight of the pickup truck briefly as it crested a hill but caught up with it at the intersection of Sawyer Street and Mitchell Road and activated his blue lights.  *Id.* ¶ 34.  The vehicle did not immediately pull over, and when the right turn signal did come on, it continued to travel some distance on Sawyer Street.  *Id.* ¶ 35.  After about twenty seconds, the vehicle finally pulled over and came to a complete stop.  *Id.* ¶ 36.[6]  Gerrish stopped Parker for speeding, a routine traffic violation.  Plaintiff's Additional SMF ¶ 7; Defendants' Reply SMF ¶ 7. While Gerrish had observed Parker driving at a high rate of speed, Parker was not driving in a reckless or dangerous manner.  *Id.* ¶ 8.[7]

When Gerrish activated his emergency lights, his dashboard-mounted cruiser video system activated and began recording events involving the driver, later identified as Parker, and SPPD officers.  Defendants' SMF ¶ 37; Plaintiff's Opposing SMF ¶ 37.  The audio portion of the recording is missing, either because the audio equipment was not functioning properly or was not turned on when the video equipment began recording.  *Id.* ¶ 39.

While Caldwell was speaking to the resident at 331 Sawyer Street about the warrant, he heard Gerrish on the radio indicating that he had stopped the vehicle.  *Id.* ¶ 40.  Caldwell decided to join

---

Defendants' SMF, at 19.
[6] Parker states that when he realized he was being pulled over, he activated his right blinker and pulled to the side of the road. Plaintiff's Additional SMF ¶ 6; Parker Dep. at 100.

Gerrish in case he needed assistance.  *Id*. ¶ 41.  Gerrish approached the vehicle and spoke to Parker, explaining why he had stopped him.  *Id*. ¶ 42.  Parker admitted having driven faster than 40 miles per hour but thought the speed limit was 35 miles per hour.  *Id*. ¶ 43.  While talking to Parker, Gerrish observed that Parker's eyes were red and glossy and could smell the odor of intoxicants coming from the vehicle.  *Id*. ¶ 44.  Gerrish asked Parker if he had had anything to drink, and Parker replied that he had had three or four drinks within the last few hours.  *Id*. ¶ 45.  Parker produced his registration and an expired insurance card, but Gerrish had to ask him three separate times to produce his driver's license.  *Id*. ¶ 46.  Parker reached into the back seat and grabbed a backpack, telling Gerrish he kept his wallet there.  *Id*. ¶ 47.  When Parker opened the bag, Gerrish observed a half-empty bottle of rum and some bottles of beer.  *Id*.  At 7:51:40, Gerrish asked Parker to step out of the vehicle to perform some field sobriety tests.  *Id*. ¶¶ 48, 52.  Parker complied.  Plaintiff's Additional SMF ¶ 13; Defendants' Reply SMF ¶ 13.

Parker was not really surprised that the officer had asked him to step out of the car to perform field sobriety tests inasmuch as he had told the officer he had three or four mixed drinks.  Defendants' SMF ¶ 50; Plaintiff's Opposing SMF ¶ 50.  Gerrish asked Parker if he was taking any medications, and he indicated he took medications for gout of the right foot; Parker can be seen on the video explaining this to Gerrish at approximately 7:51:58.  *Id*. ¶ 53.  Parker told Gerrish that he took no other drugs and that his gout medication did not affect his thinking.  *Id*. ¶ 54.  Parker appeared anxious and excited and at one point told Gerrish he was only a mile away from home and asked him to "cut him a break."  *Id*. ¶ 55.  Although Parker is shorter than Gerrish, he was wearing a shirt with no sleeves and appeared to be a large, muscular and intoxicated man.  *Id*. ¶¶ 57, 168.

---

[7] My recitation incorporates the defendants' qualification.

Gerrish asked Parker to perform a number of field sobriety tests, and Parker complied. Plaintiff's Additional SMF ¶ 14; Parker Dep. at 101.[8]  Beginning at 7:52:14, Gerrish performed the horizontal gaze nystagmus ("HGN") test.  Defendants' SMF ¶ 58; Plaintiff's Opposing SMF ¶ 58.  He observed a lack of smooth pursuit in both of Parker's eyes, as well as a demonstrated inability to follow Gerrish's directions to keep following the movement of his pen with Parker's eyes.  *Id*.  From that test and other facts, Gerrish concluded that Parker was impaired.  Plaintiff's Additional SMF ¶ 16; Defendants' Reply SMF ¶ 16.[9]  During Gerrish's administration of the test, Caldwell arrived as backup.  Defendants' SMF ¶ 59; Plaintiff's Opposing SMF ¶ 59.

Gerrish then asked Parker to recite a portion of the alphabet and to count backward from sixty-nine to fifty-three.  *Id*. ¶ 63.  Parker informed Gerrish that he had graduated from high school and attended college, but he failed to perform either the alphabet or numeric test satisfactorily.  *Id*. ¶ 64.  Parker testified that he believed he probably did poorly on the tests.  *Id*. ¶ 65.

Parker was next asked to perform a test requiring him to stand on one leg and raise the other one off the ground.  Plaintiff's Additional SMF ¶ 19; Defendants' Reply SMF ¶ 19.  At 7:54:45, Gerrish can be seen on the video explaining the one-leg stand test to Parker.  Defendants' SMF ¶ 66; Plaintiff's Opposing SMF ¶ 66.  Parker indicated that his right foot was "bad" because of gout and gestured toward that foot.  *Id*.  Parker did indicate that there was nothing wrong with his left foot, so Gerrish explained that he should lift his "bad" foot off the ground while standing with his weight on his good foot.  *Id*. ¶ 67.  Beginning at 7:54:50 Gerrish can be seen demonstrating the one-leg stand test for Parker.  *Id*. ¶ 68.  He told him he could begin when he was ready.  *Id*.  When Gerrish asked Parker if he was going to perform the test, Parker asked Gerrish to explain it all over again.  *Id*. ¶ 71.  At

---

[8] The defendants deny paragraph 14, asserting that it is not supported by the citations given.  *See* Defendants' Reply SMF ¶ 14.  Their objections is overruled as to that portion of paragraph 14 set forth above and otherwise sustained.

[9] My recitation incorporates the defendants' qualification.

7:55:36, Gerrish can be seen explaining and demonstrating the test again, as requested. *Id*. ¶ 72. When Gerrish asked Parker again to begin the test when he was ready, Parker asked Gerrish to explain it a third time. *Id*. ¶ 73. Parker also continued to divert his attention from Gerrish and focus on Caldwell, which is seen on the video at 7:56:00. *Id*. ¶ 74.[10] Parker turned to his left to look at Caldwell, who was making gestures that Parker found intimidating. Plaintiff's Additional SMF ¶ 20; Defendants' Reply SMF ¶ 20.[11] Caldwell was not in uniform, but was dressed in plainclothes. *Id*.¶ 21. It was not until later that Parker was advised that Caldwell was a plainclothed officer. Plaintiff's Additional SMF ¶ 22; Parker Dep. at 37.[12] After glancing toward Caldwell, Parker turned back toward Gerrish and stood with his arms crossed in front of his chest as he continued to listen to instructions from Gerrish. Plaintiff's Additional SMF ¶ 23; Defendants' Reply SMF ¶ 23.[13]

When Gerrish got Parker's attention again, at 7:56:06, he demonstrated the test yet again. Defendants' SMF ¶ 75; Plaintiff's Opposing SMF ¶ 75. At that point, Gerrish both told Parker what he needed to do in the test and demonstrated it for him for approximately thirty seconds. *Id*. ¶ 76. At 7:56:37, Parker began his attempt to try to stand on one leg and keep his balance while holding his hands at his side, as instructed and demonstrated. *Id*. ¶ 77.

During the one-leg-stand test, at 7:56:40, Gerrish's supervisor, Bernard, who had been on patrol in South Portland, arrived at the scene of the Parker traffic stop on his motorcycle. *Id*. ¶¶ 78-

---

[10] The plaintiff qualifies this statement, asserting that he glanced briefly in Caldwell's direction for about five seconds beginning at 7:56:00. Plaintiff's Opposing SMF ¶ 74; DVD containing Stephen Parker Cruiser Video Footage ("DVD"), Exh. 3 to Plaintiff's Additional SMF, at 7:56:00-7:56:05.

[11] The defendants qualify paragraph 20, admitting that Parker turned to look at Caldwell but otherwise denying that the statement is supported by the citations given. *See* Defendants' Reply SMF ¶ 20. Their objection is sustained as to the plaintiff's assertion that Caldwell was making comments Parker found intimidating, *see* Plaintiff's Additional SMF ¶ 20, but otherwise overruled.

[12] The defendants purport to qualify this statement but effectively deny it, asserting that Gerrish explained to Parker during the HGN test that Caldwell was a police officer. *See* Defendants' Reply SMF ¶ 22. I view the record in the light most favorable to the plaintiff, as nonmovant.

[13] The defendants qualify this statement, asserting that from 7:56:06 to 7:56:36 Parker can be seen talking and gesturing to Gerrish, and from 7:56:36 to 7:56:37 he can be seen stomping his left foot up and down. *See* Defendants' Reply SMF ¶ 23. Parker can be seen standing with his arms crossed – although he briefly puts them down then crosses them again – until 7:56:33, when he does begin (*continued on next page*)

79. After watching Bernard drive past on his way to turning around and returning, Parker turned his attention back to Caldwell. *Id*. ¶ 80.[14] Parker failed the one-leg test miserably, hopping around on one leg and then throwing his hands in the air. *Id*. ¶ 83.[15] At 7:57:02 Parker showed his frustration by throwing his hands up in the air and gesturing. *Id*. ¶ 85.[16] Parker realized that he had not performed the test as requested. Plaintiff's Additional SMF ¶ 26; Defendants' Reply SMF ¶ 26. At no point during the time when Gerrish was testing him was Parker in any way acting in a threatening manner toward Gerrish. *Id*. ¶ 27. Based upon the tests and Parker's admissions, Gerrish had probable cause to arrest him for operating under the influence. *Id*. ¶ 28. There was no need for Gerrish to conduct any further testing to establish probable cause for placing Parker under arrest. *Id*. ¶ 29.

Without any direction from Gerrish, Parker turned his back to him, placed his hands on the back of the vehicle and said something to the effect, "Do what you got to." Defendants' SMF ¶ 86; Plaintiff's Opposing SMF ¶ 86. Parker testified that he put himself in the most defenseless position, like one sees on television. Plaintiff's Additional SMF ¶ 31; Defendants' Reply SMF ¶ 31.[17] Gerrish observed that Parker seemed frustrated by his inability to perform the one-leg-raise test. *Id*. ¶ 32.[18] Caldwell observed that it appeared that Parker wanted to be arrested at that point. *Id*. ¶ 34. For his part, Parker expected that he would be patted down, handcuffed and arrested. *Id*. ¶ 35. Instead of accepting his submission and arresting Parker, Caldwell ordered him to turn back around, saying something to the effect, "I'll tell you when to do that." Plaintiff's Additional SMF ¶ 37; Parker Dep. at

---

gesturing while speaking to Gerrish. *See* DVD at 7:56:06-7:56:37.

[14] The plaintiff qualifies this statement, asserting that, at 7:56:46, he can be seen looking in Caldwell's direction for approximately two-and-a-half seconds. Plaintiff's Opposing SMF ¶ 80; DVD at 7:56:46-7:59:49.

[15] The plaintiff qualifies this statement, asserting that he was able to hold his leg up straight in the air for several seconds before losing his balance. Plaintiff's Opposing SMF ¶ 83; DVD at 7:56:50-7:57:00.

[16] My recitation incorporates the plaintiff's qualification.

[17] My recitation incorporates the defendants' qualification.

[18] My recitation incorporates the defendants' qualification.

14

47.  This command was echoed by Gerrish.  Plaintiff's Additional SMF ¶ 38; Parker Dep. at 47.[19]

Parker complied and turned back around to face Gerrish.  Plaintiff's Additional SMF ¶ 39;

Defendants' Reply SMF ¶ 39.  As he turned around, Parker stuck his middle finger out and said

something to Caldwell to the effect, "I don't even know who the fuck you are."  Plaintiff's Additional

SMF ¶ 40; Parker Dep. at 47-48.[20]  These were the first words Parker said to Caldwell.  Plaintiff's

Additional SMF ¶ 41; Defendants' Reply SMF ¶ 41.  Gerrish then told Parker not to worry about

Caldwell because he was also a police officer; Caldwell removed his badge from his shirt and

showed it to Parker.  *Id*. ¶ 42.[21]

     As he had done before turning to face his truck, Parker stood with his arms crossed in front of

his chest.  *Id*. ¶ 43.  Parker still had not been placed under arrest.  *Id*. ¶ 44.  Gerrish did not tell Parker

to uncross his arms.  *Id*. ¶ 45.  Nothing about Parker's crossing of his arms caused Gerrish to fear that

Parker posed a risk of imminent harm to him.  *Id*. ¶ 46.[22]  Despite ordering Parker to turn back around

after Parker had already submitted to arrest, Gerrish did not conduct any more field sobriety tests and

merely asked Parker to rank his level of intoxication on a scale from one to ten.  *Id*. ¶ 47.  Parker said

that he ranked himself a two.  *Id*. ¶ 48.[23]

     Gerrish then approached Parker and grabbed his left arm, which was crossed over his right

arm in front of his chest, and moved to Parker's left, keeping his hand on Parker's left arm.  Plaintiff's

---

[19] The defendants deny that Caldwell gave any such order, *see* Defendants' Reply SMF ¶¶ 37-38; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

[20] The defendants' objection to this statement on the ground that it is unsupported in part by the citations given, *see* Defendants' Reply SMF ¶ 40, is overruled.

[21] The defendants qualify this statement, *see* Defendants' Reply SMF ¶ 41; however, their qualification is at odds with the plaintiff's cognizable evidence, which I accept for purposes of summary judgment.

[22] My recitation incorporates the defendants' qualification.

[23] I omit the plaintiff's further statement that, as Gerrish acknowledges, this question was completely unnecessary and irrelevant to establish probable cause for arrest, *see* Plaintiff's Additional SMF ¶ 49, sustaining the defendants' objection that this statement sets forth a legal conclusion rather than a fact and is in any event unsupported by the citation given, *see* Defendants' Reply SMF ¶ 49; Deposition of Kevin S. Gerrish ("Gerrish Dep."), Exh. 4 to Gideon Aff., at 47.

15

Additional SMF ¶ 50; DVD at 7:57:22 to 7:57:23.[24]  At the same time, Caldwell was ordering Parker to turn around and put his hands behind his back.  Plaintiff's Additional SMF ¶ 52; Defendants' Reply SMF ¶ 52.  Gerrish then stepped backward as Caldwell approached from Parker's left.  *Id*. ¶ 53.  Gerrish also ordered Parker to turn around and put his hands behind his back.  *Id*. ¶ 54.  Parker unfolded his arms and began to turn around.  Plaintiff's Additional SMF ¶ 55; DVD at 7:57:27.  At the same time, Gerrish removed his handcuffs and Taser from his belt and held the handcuffs in his left hand and the Taser in his right.  Plaintiff's Additional SMF ¶ 56; DVD at 7:57:27.[25]

Gerrish pointed the Taser at Parker, but Parker did not see it because his head was already turned.  Plaintiff's Additional SMF ¶ 57; DVD at 7:57:29.[26]  Caldwell was standing several feet from Parker.  Plaintiff's Additional SMF ¶ 58; Defendants' Reply SMF ¶ 58.  Caldwell had his hands in his pockets.  *Id*.  Parker complied with the officers' orders and turned around.  Plaintiff's Additional SMF ¶ 59; Parker Dep. at 53, 103.[27]  Gerrish handed his handcuffs to Caldwell.  Plaintiff's Additional SMF ¶ 60; Defendants' Reply SMF ¶ 60.  At this point, Caldwell still had his hands in his pockets.  *Id*. ¶ 62.  Parker expected that he would be arrested.  *Id*. ¶ 63.[28]  He did place his hands behind his back, but only after making a dramatic gesture and grabbing his right wrist with his left hand and holding on

---

[24] I overrule the defendants' objection to this statement on the ground that it is not supported by the DVD citation given.  *See* Defendants' Reply SMF ¶ 50.  While, as the defendants point out, the original statement asserted that Gerrish grabbed Parker's right arm, *see* Plaintiff's Additional SMF ¶ 50, but the DVD shows that he grabbed Parker's left arm, *see* Defendants' Reply SMF ¶ 50; DVD at 7:52:22 to 7:57:23, the statement is supported but for the mistake about which arm was grabbed.  Accordingly, I have simply corrected the underlying statement.  I omit the plaintiff's further statement that Gerrish told him to uncross his arms, *see* Plaintiff's Additional SMF ¶ 51, sustaining the defendants' objection that it is unsupported by the citation provided, *see* Defendants' Reply SMF ¶ 51.

[25] The defendants object that paragraph 56 does not contain a fact but rather sets forth counsel's legal theories, argument and characterization of the evidence.  *See* Defendants' Reply SMF ¶ 56.  I sustain the objection to the extent of removing the word "calmly" and otherwise deny it.  *See* Plaintiff's Additional SMF ¶ 56.

[26] The defendants deny this statement, *see* Defendants' Reply SMF ¶ 57; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

[27] I omit the plaintiff's further statement that he turned around "to submit to arrest a second time[,]" Plaintiff's Additional SMF ¶ 59, sustaining the defendants' objection that this characterization is not supported by the record citation given, *see* Defendants' Reply SMF ¶ 59.

[28] My recitation includes the defendants' qualification.

very tightly.  Defendants' SMF ¶ 118; Plaintiff's Opposing SMF ¶ 118.[29]  By putting his hands in this

position, Parker effectively prevented Caldwell from being able to place the handcuffs on both wrists.

Defendants' SMF ¶ 119;  Affidavit of Jeffrey Caldwell ("Caldwell Aff."), attached to Defendants'

SMF, ¶ 8.[30]  Parker is a large, muscular man, 5 feet 8 inches tall and weighing 220 pounds, and is

larger than Caldwell.  Defendants' SMF ¶ 148; Caldwell Aff. ¶ 9; Parker Dep. at 5.[31]

Googins agreed that Parker complied with the request to place his hands behind his back.

Plaintiff's Additional SMF ¶ 65;  Deposition of Edward J. Googins ("Googins Dep."), Exh. 3 to

Gideon Aff., at 67.[32]  When Parker was told to put his hands behind his back, he was not given any

specific instructions on how to hold his hands.  Plaintiff's Additional SMF ¶ 66; Parker Dep. at 54.

He put his hands as close together as he could, knowing that Caldwell was handcuffing him.

Plaintiff's Additional SMF ¶ 66; Parker Dep. at 56-57.  He clasped his hands together behind his back

because he wanted it to be clear that he had no intention to use his hands in any threatening manner.

Plaintiff's Additional SMF ¶ 66; Parker Dep. at 53, 57.[33]  When law-enforcement officers instruct

subjects to place their hands behind their backs without more specific directions, subjects do not

always put their hands in the same place.  Plaintiff's Additional SMF ¶ 68; Defendants' Reply SMF ¶

68.  It is the police officer, not the subject, who is knowledgeable about how the hands need to be

---

[29] The plaintiff qualifies this statement, asserting, *inter alia*, that he complied with the request of Caldwell and Gerrish to turn around and placed his hands behind his back.  *See* Plaintiff's Opposing SMF ¶ 118; Parker Dep. at 53, 57; Gerrish Dep. at 58-59.

[30] The plaintiff purports to deny this statement; however, while his statement explains that he did not intend to prevent the handcuffing, it does not controvert that his hand position did effectively prevent it.  *See* Plaintiff's Opposing SMF ¶ 119.

[31] I omit the defendants' characterization of Parker as "quite a bit larger than" Caldwell, *see* Defendants' SMF ¶ 148, which the plaintiff denies, *see* Plaintiff's Opposing SMF ¶ 148.

[32] The defendants deny this statement, *see* Defendants' Reply SMF ¶ 65; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

[33] The defendants object that paragraph 66 is not supported by the citations given.  *See* Defendants' Reply SMF ¶ 66.  The objection is overruled as to those portions of paragraph 66 set forth above and otherwise sustained.

positioned in order to apply handcuffs. *Id*.[34] It was not unreasonable for Parker to place his hands behind his back in the manner that he did, with his right wrist in his left hand. *Id*. ¶ 69.[35]

At 7:57:35 Bernard, also pointing his Taser at Parker, approached from across the street on Gerrish's left to provide additional assistance if needed. Defendants' SMF ¶ 115; Plaintiff's Opposing SMF ¶ 115. Had Bernard believed that Parker posed an imminent risk to the other officers he would have run, not walked, to the scene. Plaintiff's Additional SMF ¶ 74; Defendants' Reply SMF ¶ 74. At 7:57:37 Caldwell began to apply the handcuff to Parker's left wrist, completing that within a couple of seconds. Defendants' SMF ¶ 122; Plaintiff's Opposing SMF ¶ 122. Parker felt the handcuff slip onto his left wrist. Plaintiff's Additional SMF ¶ 71; Defendants' Reply SMF ¶ 71. At 7:57:39 Caldwell attempted to complete the handcuffing by having Parker release his grip on his right wrist and allow it to be placed in a position to be handcuffed. Defendants' SMF ¶ 124; Plaintiff's Opposing SMF ¶ 124. Caldwell instructed Parker to relax his hands. Plaintiff's Additional SMF ¶ 75; Defendants' Reply SMF ¶ 75. At the same time, Caldwell was pulling Parker's hands apart. *Id.* ¶ 76.[36]

Caldwell acknowledges that Parker relaxed his right hand as requested. Plaintiff's Additional SMF ¶ 77; Deposition of Jeffrey Caldwell ("Caldwell Dep."), Exh. 5 to Gideon Aff., at 23. While Parker does not recall voluntarily releasing his hands, he does recall that he did not resist Caldwell. Plaintiff's Additional SMF ¶ 77; Parker Dep. at 56-57. [37] Caldwell states that as Parker's right hand released, his right arm began to move forward "in a manner that I thought he could swing around and

---

[34] My recitation incorporates the defendants' qualification.

[35] The defendants qualify this statement, asserting that Parker testified that he reached around and grabbed one hand with the other in order to lock his hands behind his back. *See* Defendants' Reply SMF ¶ 69; Parker Dep. at 53.

[36] I omit the balance of paragraph 76, *see* Plaintiff's Additional SMF ¶ 76, sustaining the defendants' objection that it is not supported by the citation given, *see* Defendants' Reply SMF ¶ 76.

[37] The defendants object that paragraph 77 contains argument, counsel's legal conclusions and is not a "fact" within the meaning of Local Rule 56(f). *See* Defendants' Reply SMF ¶ 77. The objection is overruled. I have set forth so much of paragraph 77 as is supported by the citations given.

hit me." Plaintiff's Additional SMF ¶ 78; Defendants' Reply SMF ¶ 78.[38]  To the extent that Parker's

right arm moved at all, it moved at most a couple of inches, and such movement was consistent with

Caldwell's request that Parker relax his hands coupled with Caldwell pulling Parker's hands apart.

*Id*. ¶ 80.[39]  It is not unusual for a police officer to have to move a subject's hands in order to position

them properly to get them into handcuffs.  *Id*. ¶ 81.[40]

Gerrish began to extend his arms forward with the Taser.  Plaintiff's Additional SMF ¶ 85;

Defendants' Reply SMF ¶ 85.[41]  Parker felt Caldwell pull his hands apart and twist his right wrist in a

counterclockwise direction.  *Id*. ¶ 86.  Gerrish then shot Parker with the Taser.  Plaintiff's Additional

SMF ¶ 87; Parker Dep. at 56-57.[42]  Prior to being shot with the Taser, Parker received no warnings

that he was about to be shot and did not observe the Taser gun pointed at him.  Plaintiff's Additional

SMF ¶¶ 88-89; Parker Dep. at 110.[43]  In fact, it was not until some time later that Parker learned he

had been Tased.  Plaintiff's Additional SMF ¶ 90; Parker Dep. at 57.[44]

---

[38] I omit Plaintiff's Additional SMF ¶ 79 (asserting that Caldwell's testimony is belied by the videotape evidence), sustaining the defendants' objection that this statement consists of argument rather than fact.  *See* Defendants' Reply SMF ¶ 79.

[39] The defendants qualify this statement, asserting that Caldwell's full testimony was that the moving of Parker's hand forward a couple of inches amounted to a threat of assault against him in that situation.  Defendants' Reply SMF ¶ 80; Caldwell Dep. at 23-24.

[40] The defendants qualify this statement, asserting that (i) Googins further testified that having to pull someone's hands apart who has a hand locked around his wrist is more unusual, and (ii) Caldwell further testified that he never saw anyone put his hands together in the manner Parker had.  Defendants' Reply SMF ¶ 81; Googins Dep. at 68; Caldwell Dep. at 22.

[41] I omit paragraphs 83 and 84 of the Plaintiff's Additional SMF, in which the plaintiff attempts to use the DVD to refute certain of the defendants' assertions.  *See* Plaintiff's Additional SMF ¶¶ 83-84.  The plaintiff states that the videotape does not show the movement of Parker's right shoulder and arm claimed by Gerrish.  *See id.* ¶ 83.  However, given the angle at which the video footage was shot, the plaintiff's arm and shoulder are not clearly visible, and it is very difficult to discern what sort of shoulder and arm movement was made, let alone how Gerrish would have perceived any such movement.  *See* DVD at 7:57:44.  The plaintiff also states that Caldwell's testimony that Parker pulled him off balance is inconsistent with the videotape evidence.  *See* Plaintiff's Additional SMF ¶ 84.  Again, it is difficult to tell from watching the DVD.  Caldwell does step backward as he is in the midst of trying to handcuff Parker, but it is not clear why.  *See* DVD at 7:57:44.

[42] I omit the second sentence of paragraph 87, *see* Plaintiff's Additional SMF ¶ 87, sustaining the defendants' objection that it does not fairly characterize the underlying testimony, *see* Defendants' Reply SMF ¶ 87.

[43] The defendants deny these statements, *see* Defendants' Reply SMF ¶¶ 88-89; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

[44] The defendants deny this statement, *see* Defendants' Reply SMF ¶ 90; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

When Parker was struck with the Taser probes, he spun to his right and went down to the ground. Defendants' SMF ¶ 145; Plaintiff's Opposing SMF ¶ 145. Caldwell went to the ground with Parker, and Bernard assisted him in finally completing Parker's handcuffing. *Id.* ¶ 150. While on the ground, Parker was told numerous times to stop resisting. Defendants' SMF ¶ 149; Affidavit of Kevin Gerrish ("Gerrish Aff."), attached to Defendants' SMF, ¶ 9.[45] Parker received only one five-second discharge from the Taser when it was deployed, which incapacitated him during that period of time. Defendants' SMF ¶ 152; Plaintiff's Opposing SMF ¶ 152. Parker could not breathe and lost control of his muscles. Plaintiff's Additional SMF ¶ 122; Parker Dep. at 59.[46] He struck his left elbow, and his left arm and knee were in pain. Plaintiff's Additional SMF ¶ 123; Defendants' Reply SMF ¶ 123. He felt his arms being pulled back and his head being forced down to the ground and stepped on by an officer's boot. *Id.* ¶ 124.[47] He felt his shoulders being pulled backward and experienced immediate pain in them. *Id.* ¶ 125. Once again, he felt his face being pressed forcefully into the ground and tasted blood in his mouth. *Id.* ¶ 126. After Parker was Tased and was lying on the ground, he began calling Caldwell names, including "bald fuck" and "motherfucker." *Id.* ¶ 127. Parker had not called Caldwell those names before being Tased. *Id.* ¶ 128. Parker continued to swear and yell at the officers and spit on the ground near them. Defendants' SMF ¶ 155; Gerrish Aff. ¶ 9.[48]

Parker had a small abrasion on his left knee and elbow from where he hit the ground. Defendants' SMF ¶ 153; Plaintiff's Opposing SMF ¶ 153.[49] Pursuant to SPPD policy, a rescue unit

---

[45] I omit the balance of paragraph 149, which the plaintiff denies and which is not supported by the citation given. *See* Plaintiff's Opposing SMF ¶ 149.

[46] The defendants deny this statement, *see* Defendants' Reply SMF ¶ 122; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

[47] The defendants qualify this statement, asserting that Bernard used his knee, not his boot, to keep Parker's head down to prevent him from spitting at the officers. *See* Defendants' Reply SMF ¶ 124; Affidavit of Todd Bernard ("Bernard Aff.") attached to Defendants' SMF, ¶ 6.

[48] The plaintiff purports to deny this statement, but his assertions do not controvert it. *See* Plaintiff's Opposing SMF ¶ 155.

[49] I omit the plaintiff's statement that he tore his rotator cuff and is disabled as a result of being shot by the Taser, *see* Plaintiff's Additional SMF ¶ 3, sustaining the defendants' objection that the plaintiff cannot offer lay opinion as to the nature of such injuries, *see* (*continued on next page*)

was called to evaluate Parker after the Taser had been used against him.  *Id.* ¶ 160.  While the rescue

was *en route*, Gerrish removed the Taser prongs from Parker's body.  *Id.* ¶ 161.  In Parker's vehicle,

Gerrish found rum and bottles of beer as well as a partly full plastic cup of cold beer in the door on

the passenger's side.  *Id.* ¶ 162.  In view of complaints made by Parker, the rescue crew advised

Gerrish that it would transport Parker to the hospital.  *Id.* ¶ 163.  Gerrish rode with Parker as he was

transported to the hospital without incident.  *Id.* ¶ 164.  A blood sample was taken at the hospital for

blood/alcohol testing, which was measured at .19, more than twice the legal limit.  *Id.* ¶ 165.[50]

      Parker was not carrying weapons of any sort.  Plaintiff's Additional SMF ¶ 95; Defendants'

Reply SMF ¶ 95.[51]  Parker had no previous history of assaulting a police officer.  *Id.* ¶ 96.  Indeed, he

had no prior convictions for any assault-related criminal offense.  *Id.* ¶ 97.  Law-enforcement officers

regularly find themselves subjected to verbal insults, and they understand that dealing with such insults

is part of the job.  *Id.* ¶ 99.  Although Bernard had his Taser drawn, he did not see any need to fire it.

---

Defendants' Reply SMF ¶ 3; *see also, e.g., Dowe v. National R.R. Passenger Corp.*, No. 01 C 5808, 2004 WL 887410, at *11 (N.D. Ill. Apr. 26, 2004) (granting request "to bar lay opinions regarding the nature and extent of injuries suffered by the plaintiffs"); *McGary v. Frausto*, No. 99 C 7132, 2002 WL 1182331, at *2 (N.D. Ill. June 4, 2002) (granting motion to bar plaintiffs from giving lay opinion testimony concerning their medical condition and injuries); *compare, e.g., Batiste v. City of Beaumont*, 426 F. Supp.2d 395, 403 (E.D. Tex. 2006) ("[A] lay person is competent to testify concerning physical injuries and conditions that are susceptible to observation by an ordinary person. Burns, bruises and topical lacerations are not of the character as to require skilled and professional persons to determine the cause and extent thereof.") (citations omitted).

[50] The defendants tell a divergent story of Parker's encounter with South Portland officers, particularly with regard to the critical few minutes leading up to the firing of the Taser.  For example, the defendants assert that (i) Parker's demeanor became increasingly hostile, aggressive and defiant, particularly toward Caldwell, *see, e.g.*, Defendants' SMF ¶¶ 84, 116, 133, (ii) Parker refused Gerrish's order to uncross his arms and place them behind his back for handcuffing, *see id.* ¶ 95, (iii) Parker then actively resisted Gerrish's efforts to pull his arms down so he could handcuff him, pushing out his chest and tightening his arm muscles, *see id.* ¶ 96, (iv) both Caldwell and Gerrish anticipated a physical struggle to induce Parker to submit to handcuffing, *see id.* ¶¶ 100-01, (v) Gerrish warned Parker more than once to stop resisting or he would be Tased, *see id.* ¶¶ 108, 126, (vi) when Caldwell finally managed to pry Parker's hands apart to apply the second handcuff, Parker immediately tried to pull his right hand away from Caldwell's grasp and to his front as Caldwell struggled to hold onto it, *see id.* ¶ 130, (vii) Caldwell was concerned that Parker might try to strike him and could use the dangling handcuff as a weapon, *see id.* ¶¶ 130-32, and (viii) Gerrish observed Parker pulling Caldwell off balance and also was concerned for Caldwell's safety, as a result of which he fired his Taser at Parker, *see id.* ¶¶ 134-42.  I have omitted all statements of the defendants that are inconsistent with the plaintiff's cognizable version of events.  While it is, of course, impossible to directly controvert various defendants' statements concerning their subjective frame of mind, the plaintiff adduces sufficient cognizable evidence to raise a genuine issue of material fact whether those defendants did in fact harbor the stated fears or whether any such stated fears would have been objectively reasonable in the circumstances (as the plaintiff recounts them).

[51] The defendants qualify this statement, asserting that from the point Parker had a handcuff dangling from his left wrist, he could have used it as a weapon against Caldwell.  *See* Defendants' Reply SMF ¶ 95; Caldwell Aff. ¶ 8.

*Id*. ¶ 100.[52]  If Bernard had felt that Parker posed an imminent risk of harm to any of the officers, he would have fired his Taser.  *Id*. ¶ 101.

At the time Parker was shot with the Taser, he was surrounded by three male officers. Plaintiff's Additional SMF ¶ 102; Parker Dep. at 104-05.[53]  Gerrish was both taller and heavier than Parker.  Plaintiff's Additional SMF ¶ 103; Defendants' Reply SMF ¶ 103.[54]  Prior to being shot with the Taser, Parker was not resisting arrest in any way.  Plaintiff's Additional SMF ¶ 104; Parker Dep. at 57.[55]  At no point did Parker raise a hand to any of the officers or strike at them.  Plaintiff's Additional SMF ¶ 105; Defendants' Reply SMF ¶ 105.  At no point did Parker kick any officer.  *Id*. ¶ 106.  At no point did Parker do anything physically provocative toward any of the officers. Plaintiff's Additional SMF ¶ 107; Parker Dep. at 104.[56]  At no point did Parker attempt to assault any of the officers.  Plaintiff's Additional SMF ¶ 108; Defendants' Reply SMF ¶ 108.[57]  At no point did Parker attempt to flee the scene.  Plaintiff's Additional SMF ¶ 120; Parker Dep. at 105-06.[58]

Gerrish acknowledges that from the time of the initial traffic stop to the point of Tasing, the momentary movement of Parker's right arm is the only conduct that he would characterize as assaultive on Parker's part.  Plaintiff's Additional SMF ¶ 109; Defendants' Reply SMF ¶ 109.[59]  Gerrish

---

[52] The defendants qualify this statement, *see* Defendants' SMF ¶ 100; however, inasmuch as their qualification is inconsistent with the plaintiff's cognizable version of events, I omit it.

[53] The defendants' objection to this statement on grounds that it contains argument and legal conclusions and that the record citations do not support the allegation that the plaintiff was "surrounded[,]" Defendants' Reply SMF ¶ 102, is overruled.

[54] The defendants qualify this statement, asserting that Caldwell, the officer who was trying to handcuff Parker, is smaller than him. Defendants' Reply SMF ¶ 103; Parker Dep. at 5; Caldwell Aff. ¶ 9.

[55] The defendants deny this statement, *see* Defendants' Reply SMF ¶ 104; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

[56] The defendants deny this statement, *see* Defendants' Reply SMF ¶ 107; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

[57] The defendants qualify this statement, asserting that from the point Parker had a handcuff dangling from his left wrist, he could have used it as a weapon against Caldwell.  *See* Defendants' Reply SMF ¶ 108; Caldwell Aff. ¶ 8.

[58] The defendants' objection to this statement on grounds that it contains argument and legal conclusions and is not supported by the citations given, *see* Defendants' Reply SMF ¶ 120, is overruled with respect to portions of that paragraph set forth above and otherwise sustained.

[59] I omit the plaintiff's further statement that Gerrish's claim that the Tasing was justified by a threatening movement of Parker's right shoulder is not supported by the videotape, *see* Plaintiff's Additional SMF ¶ 110, sustaining the defendants' objection that this (*continued on next page*)

acknowledges that he could not see Parker's right arm because he was on Parker's left side, and Parker's body was blocking his view of Parker's right arm. *Id*. ¶ 111. Gerrish observed Parker's left hand release from his right hand. *Id*. ¶ 112.[60] There are occasions in which a subject flinches or tenses up as handcuffs are being applied. *Id*. ¶ 114.[61] This is so because the positioning of the hands behind the back to apply handcuffs is not a normal hand position. *Id*. ¶ 115. It can be a little awkward and uncomfortable for people. *Id*. ¶ 116.[62] It is not unusual for a larger person to have some difficulty getting his or hands in exactly the right position. *Id*. ¶ 117.[63] Caldwell, who was in the process of handcuffing Parker, never requested that the other officers Tase Parker. *Id*. ¶ 119.

With respect to physical threat, officers are trained that they should consider things such as offender/officer size and ability. *Id*. ¶ 187. In this case, Gerrish acknowledged his size advantage over Parker. *Id*. Officers are also trained to consider persons present. *Id*. ¶ 189.[64] In this case, there were three officers present and only one suspect. *Id*. Officers are also instructed to consider the subject's "active resistance" or any attempt to evade arrest by flight. Plaintiff's Additional SMF ¶ 190; Ryan Aff. ¶ 45.[65] Although "active resistance" is a common term in law enforcement, Gerrish

---

statement is in the nature of an argument or legal conclusion rather than a fact, *see* Defendants' Reply SMF ¶ 110.

[60] The defendants qualify this statement, asserting that Gerrish observed Parker's right shoulder come forward and dip down and saw Caldwell start to come off his tippy toes and lean forward toward Parker's right shoulder. Defendants' Reply SMF ¶ 112; Gerrish Dep. at 64.

[61] My recitation incorporates the defendants' qualification.

[62] My recitation incorporates the defendants' qualification.

[63] My recitation incorporates the defendants' qualification.

[64] The defendants' objection to this statement on the bases that it is irrelevant and "violative of" Federal Rule of Evidence 702 inasmuch as (i) it suggests there is only one universal method of training police officers, though no authority is cited in support thereof other than Ryan himself, and (ii) it fails to establish a predicate that SPPD officers are so trained, *see* Defendants' Reply SMF ¶ 189, is overruled. I am satisfied that Ryan's background, training and experience qualify him as an expert on the subject of police training in general and training in use of force in particular. Ryan has twenty' years experience as a police officer, including as a former director of training, and has made a recent career of advising police agencies in matters including the appropriate use of force. *See* Ryan Aff. ¶¶ 1, 3-10. Whether there are other methods of training goes to the weight, not the admissibility, of his opinion. The plaintiff's failure to establish that SPPD officers are so trained does not render Ryan's opinion irrelevant; the plaintiff is seeking to compare the SPPD officers' actions against the benchmark of generally accepted police practice and training.

[65] The defendants' objection to this statement on grounds that it is irrelevant and "violative of" Federal Rule of Evidence 702 inasmuch as (i) it suggests there is only one universal method of training police officers, though no authority is cited in support thereof other than Ryan himself, and (ii) it fails to establish a predicate that SPPD officers are so trained, *see* Defendants' Reply SMF ¶ 190, is overruled (*continued on next page*)

indicated that he did not know or use this term.  Plaintiff's Additional SMF ¶ 191; Ryan Aff. ¶ 46.

Gerrish, according to testimony, was familiar with the term "passive" resistance.  *Id*.  Agencies

throughout the country regularly use these two terms to provide officers with direction on the

appropriate level of force.  *Id*.[66]  Agencies throughout the United States regularly provide officers with

clear definitions of subject resistance levels so that officers will be provided with clear direction on

the appropriate subject control response.  Plaintiff's Additional SMF ¶ 192; Ryan Aff. ¶ 47.[67]

       After an SPPD officer uses force against a subject, he or she is required to complete a use-of-

force report.  Plaintiff's Additional SMF ¶ 159; Defendants' Reply SMF ¶ 159.  A use-of-force report

is required when a Taser is used against a subject.  *Id*. ¶ 160.  The Force Review Board investigates

the reported use of force; the investigation includes review of the use-of-force report, statements,

interviews and other available evidence.  *Id*. ¶ 162.  The purpose of its review is to determine

whether the use of force was appropriate and complied with the Use of Force Policy.  *Id*. ¶ 163.  In

determining whether the use of force complied with the policy, the Force Review Board makes a

determination whether the use of force was reasonable in the circumstances.  *Id*. ¶ 164.  If the Force

Review Board determines that a use of force is not appropriate, it refers the matter for an internal

investigation.  *Id*. ¶ 170.  In addition, complaints about uses of force by South Portland officers

automatically result in initiation of a formal investigation to determine whether the force used was

---

for reasons discussed in conjunction with Plaintiff's Additional SMF ¶ 189, above.  The defendants also object that the statement constitutes an impermissible opinion on the subject of the applicable standard of law.  *See id.*  That objection, as well, is overruled. Ryan addresses the manner in which police are trained, not the standard of law that should apply to decision of this case.

[66] The defendants' objection to paragraph 191 on the basis that Ryan "does nothing more than paraphrase in his own words a portion of the actual deposition testimony, which itself is not provided[,]" Defendants' Reply SMF ¶ 191, is overruled.  Ryan is not merely regurgitating Gerrish's testimony; he is placing Gerrish's testimony, which he indicated he reviewed, in the context of generally accepted police practice and training.  *See, e.g.*, Ryan Aff. ¶¶ 25(b), 46.  This is an acceptable practice for an expert.  *See, e.g.*, Fed. R. Evid. 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.").  The defendants do not suggest that Ryan misstated Gerrish's testimony.  *See* Defendants' Reply SMF ¶ 191.

[67] The defendants' objection to this statement on the bases that it is irrelevant, "violative of" Federal Rule of Evidence 702 and constitutes an impermissible opinion as to the applicable standard of law, *see* Defendants' Reply SMF ¶ 192, is overruled for the (*continued on next page*)

lawful and in accordance with the department's use-of-force policy.  Defendants' SMF ¶ 188; Plaintiff's Opposing SMF ¶ 188.

In the last five years, the Force Review Board has concluded in every instance in which it has reviewed a use of force that the force was appropriate and consistent with the department's policies. Plaintiff's Additional SMF ¶ 171; Defendants' Reply SMF ¶ 171.  From 2002 through 2005, the Force Review Board reviewed 114 incidents in which force was used.  *Id*. ¶ 172.  In each instance, it sanctioned the use of force as consistent with departmental policies.  *Id*.  Googins cannot recall a single occasion during his twelve years as chief in which the Force Review Board has found any use of force to be inappropriate or in violation of policies.  *Id*. ¶ 173.[68]

Force Review Board members are sergeants or lieutenants who are in supervisory positions within the department.  Defendants' SMF ¶ 184; Plaintiff's Opposing SMF ¶ 184.  The Force Review Board that reviewed the Parker incident was composed of Bernard, Sergeant David Smith and Sergeant Chris Cook.  Plaintiff's Additional SMF ¶ 168; Defendants' Reply SMF ¶ 168.  Bernard was the ranking officer on the scene at the time of the Tasing; he also had drawn his Taser when Gerrish shot Parker.  *Id*. ¶ 169.

Following the receipt of a Notice of Claim from Parker concerning use of force in his arrest, an internal affairs investigation was automatically initiated.  Defendants' SMF ¶ 209; Plaintiff's Opposing SMF ¶ 209.  Although he was requested to provide his version of events, Parker did not do so.  Defendants' SMF ¶ 210; Affidavit of Edward J. Googins ("Googins Aff."), attached to Defendants' SMF, ¶ 4.[69]  Ultimately, both the Force Review Board and the internal affairs

---

reasons discussed in conjunction with Plaintiff's Additional SMF ¶¶ 189-90, above.

[68] The defendants qualify this statement, asserting that Googins testified that some uses of force have been the subject of discipline but that going back over his twelve-year tenure as chief of police, he could not recall which, if any, were based on the recommendations of the Force Review Board.  Defendants' Reply SMF ¶ 173; Googins Dep. at 35.

[69] I omit the defendants' further statement that the SPPD's efforts to reach Parker were made more difficult by the fact he had been deployed as a merchant marine.  *See* Defendants' SMF ¶ 210.  The plaintiff denies this, asserting that he provided no statement on the (*continued on next page*)

investigation concluded that the use of the Taser was justified and in keeping with departmental policy to overcome Parker's resistance to being taken into lawful custody following his arrest for operating under the influence. Defendants' SMF ¶ 211; Plaintiff's Opposing SMF ¶ 211. Googins personally viewed the officers' reports and the video recording of the Taser use in Parker's case and also concluded that its use in his case was warranted and in keeping with his department's use-of-force policy and applicable law. *Id.* ¶ 212.

Googins testified that under South Portland's policies, active aggression on the part of a subject is not required to justify the use of a Taser. Plaintiff's Additional SMF ¶ 177; Defendants' Reply SMF ¶ 177.[70]   Asked what action or conduct on Parker's part justified the use of the Taser against him, Googins responded: "It appeared to me that he was not allowing himself to be taken into custody or to be handcuffed." *Id.* ¶ 181. Bernard testified as follows:

> Q:     Do you believe that the use of force policy of South Portland permits the use of Taser force to bring somebody into custody who is merely passively resisting?
>
> A:     Under my definition, like I said, there's no absolutes. I'm sure I could paint you a scenario on a passively resistant person – I could come up with something that a Taser would be justified. I think in most cases, no, passively resisting, no.

*Id.* ¶ 182.[71]   In short, the use of the Taser upon Parker was consistent with and sanctioned by the policies and standard operating procedures of the SPPD. *Id.* ¶ 183.

Gerrish believes that his use of force on Parker complied with South Portland's Use of Force Policy as well as its Taser Policy. *Id.* ¶ 184. In his deposition, Gerrish testified as follows:

---

advice of counsel. *See* Plaintiff's Opposing SMF ¶ 210; Gideon Aff. ¶ 2.

[70] I omit paragraphs 178-80 of the Plaintiff's Additional SMF, sustaining the defendants' objections that they are not supported by the citations given or mischaracterize those citations by reflecting the wording of a question posed but not the answer given. *See* Defendants' Reply SMF ¶¶ 178-80.

[71] The defendants admit that this quotation is accurate but protest that it is incomplete. *See* Defendants' Reply SMF ¶ 182. Nonetheless, they fail to offer additional testimony of Bernard. *See id.*

> Q:     [I]s it your position that under South Portland Police Department's policies,
>        Tasing is appropriate to take somebody into custody who is merely passively
>        resisting arrest?
>
> A:     Appropriate, no.  Under the policy, it could be done, yes.

*Id.* ¶ 186.[72]

The decision to use a Taser to gain compliance for purposes of overcoming passive resistance is inconsistent with generally accepted practices, training and model policies related to the use of electronic control devices.  Plaintiff's Additional SMF ¶ 193; Ryan Aff. ¶ 48.[73]  The IACP Electronic Control Device Model Policy and Concept Paper 2005 provides, in relevant part, that the Taser is prohibited from being used:

> a.     In a punitive or coercive manner.
>
> b.     On a handcuffed/secured prisoner, absent overtly assaultive behavior that
>        cannot be reasonably dealt with in any other less intrusive fashion.
>
> c.     On any suspect who does not demonstrate their overt intention (1) to use
>        violence or force against the officer or another person or (2) to flee in order to
>        resist/avoid detention or arrest (in cases where officers would pursue on foot).

Plaintiff's Additional SMF ¶ 194; Defendants' Reply SMF ¶ 194.  Commentary to the IACP model policy adds:

> With these cautions in mind, E[lectronic] C[ontrol] W[eapons] may generally be
> deployed consistent with a professionally recognized philosophy of use of force, that

---

[72] I omit paragraph 185 of the Plaintiff's Additional SMF, sustaining the defendants' objection that it mischaracterizes the testimony cited.  *See* Defendants' Reply SMF ¶ 185.

[73] The defendants' objection to this statement on the bases that (i) Ryan's affidavit does not indicate that he has any particular experience or education regarding Taser use, (ii) Ryan relies on materials that an expert would not normally rely upon, and (iii) the statement is in any event irrelevant inasmuch as Parker is seen on the videotape actively resisting attempts to handcuff him, *see* Defendants' Reply SMF ¶ 193, is overruled.  Ryan has twenty' years experience as a police officer, including as a former director of training, and has made a recent career of advising police agencies in matters including the appropriate use of force.  *See* Ryan Aff. ¶¶ 1, 3-10.  For the statement in issue, he cites an International Association of Chiefs of Police ("IACP") Electronic Control Device Model Policy and Concept Paper published in 2005.  *See* Ryan Aff. ¶ 48.  The defendants make no convincing argument that such a document, which presumably represents the best thinking of law-enforcement professionals, would not reasonably be relied on by experts in this field.  *See* Defendants' Reply SMF ¶ 193.  Nor does the existence of the videotape render Ryan's opinion irrelevant.  In the absence of either audio or a range of viewing angles, the videotape simply does not tell the complete story of the Parker incident and is subject to differing interpretations.

is: use only that level of force that reasonably appears necessary to control or subdue a violent or potentially violent person.  It should also be used early enough in a confrontation or situation to prevent the incident from escalating to a point where a greater level of force might be necessary.

*Id.*[74]

Prior to July 20, 2005 the SPPD had not received any complaints about Taser use by its officers in connection with physical arrests.  Defendants' SMF ¶ 201; Plaintiff's Opposing SMF ¶ 201.  The instant lawsuit is the first complaint alleging that the use of a Taser constituted an unreasonable use of force.  *Id.* ¶ 202.  There was no history of inappropriate use of force by Bernard, Caldwell or Gerrish that would have put South Portland on notice of any problems regarding unreasonable use of force by those officers or the need for additional training or supervision.  *Id.* ¶ 204.[75]

In the three years prior to the Parker arrest, the 116 arrests by South Portland officers that triggered required use-of-force reporting resulted in only three complaints (about two percent of the cases in which the use of force was reported) by the persons arrested about the level of force used against them (two in 2002, one in 2003 and none in 2004), and none of these complaints involved either the use of a Taser or the officers involved in Parker's arrest.  Defendants' SMF ¶ 207; Googins Aff. ¶ 3.[76]  In the three-year period prior to 2005, all evidence was that the use of physical force in connection with arrests was not frequent (ninety-five percent involved no reportable use of force)

---

[74] My recitation incorporates the defendants' qualification.  The defendants seek to put in evidence the entire IACP policy by virtue of reference to it in their reply brief, *see* Defendants' S/J Reply at 4-6; however, I consider only such portions as are properly put in play pursuant to Local Rule 56 by mention in their statements of material facts.  I omit paragraph 195 of the Plaintiff's Additional SMF, sustaining the defendants' objection that it is not supported by a record citation.  *See* Defendants' Reply SMF ¶ 195.

[75] The plaintiff purports to qualify this statement, *see* Plaintiff's Opposing SMF ¶ 204; however, his qualification sets forth legal argument rather than fact and is improperly supported by citation to a number of paragraphs of his statement of additional material facts, *see* Loc. R. 56(c), on the bases of which it is omitted.

[76] The plaintiff's objection to this statement on the ground that it is not supported by the citation given, *see* Plaintiff's Opposing SMF ¶ 207, is overruled to the extent I have set forth the statement, above, and otherwise sustained.

28

when compared with the total number of arrests, and when force was used, it was used lawfully and in accordance with departmental policy. Defendants' SMF ¶ 208; Plaintiff's Opposing SMF ¶ 208.[77]

Googins was not involved in the hiring of Bernard or Caldwell, as each of them already was an SPPD employee when Googins began work for the department more than twelve years ago. *Id*. ¶ 214. Of the officers involved, only Gerrish was hired as an employee during Googins' tenure as chief of police. *Id*. ¶ 215. Nothing in Gerrish's prior employment with the Maine Youth Center revealed any problem concerning his ability to conform his behavior to the requirements of the law concerning the use of force that would have raised concern about his hiring. *Id*. ¶ 216.

### III. Analysis

In his four-count complaint, Parker sues (i) Gerrish, Caldwell and Bernard pursuant to 42 U.S.C. § 1983 for use of excessive force against him in violation of his federal constitutional rights (Count I), *see* Complaint ¶¶ 28-31, (ii) South Portland, the SPPD and Googins pursuant to section 1983 for failure to take reasonable measures in hiring, training, supervision and discipline of South Portland police officers, or adopt adequate policies, practices and procedures, to ensure officers would not use excessive force, particularly with respect to use of a Taser gun (Count II), *see id*. ¶¶ 32-37, (iii) Gerrish, Caldwell and Bernard for negligent use of force against him (Count III), *see id*. ¶¶ 38-39, and (iv) Gerrish, Caldwell and Bernard for violation of the Maine Civil Rights Act ("MCRA"), 5 M.R.S.A. § 4682 *et seq*. (Count IV), *see id*. ¶¶ 40-41.

The defendants argue that:

---

[77] The plaintiff purports to qualify this statement, *see* Plaintiff's Opposing SMF ¶ 208; however, his qualification is in the nature of an argument and is unsupported by any record citation, on the bases of which it is omitted.

Counts I and IV (Excessive Force)

1.      Gerrish, Caldwell and Bernard are entitled to summary judgment with respect to Counts I and IV inasmuch as they employed a reasonable amount of force to effectuate Parker's arrest in view of his size, intoxication and physical resistance to arrest.  *See* Defendants' S/J Motion at 9-10.

2.      Alternatively, they are entitled to summary judgment as to those two counts on the basis of qualified immunity inasmuch as, *inter alia*, there was no definitive caselaw on July 20, 2005 that would have made the unlawfulness of their conduct in these circumstances, including use of a Taser, apparent.  *See id*. at 10-12.  With respect to the MCRA excessive-force claim, they are immune inasmuch as they subjectively believed the degree of force used was necessary to overcome Parker's resistance to being handcuffed and taken into custody.  *See id*. at 12.

3.      To the extent Parker seeks to impose liability on Bernard and Caldwell for failing to intervene to prevent Gerrish's use of the Taser,  Bernard and Caldwell are entitled to summary judgment given Parker's failure to articulate any such claim in his Complaint.  *See id*.  Alternatively, to the extent such a claim can be discerned from the Complaint, Bernard and Caldwell are entitled to summary judgment on its merits inasmuch as they were not in a position to intervene to prevent the Taser use given Gerrish's split-second decision to deploy it.  *See id*. at 12-13.

4.      Any use of force against Parker after he had been shot with the Taser was reasonable in the circumstances and did not violate clearly established law.  *See id*. at 13.

5.      To the extent Parker asserts any claim against Googins in his individual capacity arising out of his adoption of policies and his training and supervision of employees, Googins is entitled to qualified immunity inasmuch as his conduct did not violate any clearly established law.  *See id*.

Count III (Negligence)

6.      In the absence of bad faith or any conduct so egregious as to vitiate the absolute immunity available pursuant to the Maine Tort Claims Act ("MTCA"), Gerrish, Caldwell and Bernard are entitled to absolute immunity with respect to Parker's negligence claim. *See id*. at 14-15.

Count II (Municipal Liability)

7.      The SPPD is not an appropriate entity against which to lodge a municipal-liability claim. *See id*. at 15-16.

8.      With respect to the merits of the claim, the municipality had no notice of any problem with use of force generally, or use of the Taser specifically, that could give rise to a charge of deliberate indifference. *See id*. at 16-17.

9.      The record is devoid of any evidence of an unconstitutional custom, policy or practice of deliberate indifference to the supervision or training of personnel with respect to lawful use of force during arrests. *See id*. at 17.

10.     Even assuming *arguendo* that Parker could prove inadequate training in arrests and/or use of force, he is missing an essential element of a constitutional claim against a municipality: a causal connection between the assertedly unconstitutional policy or practice and the complained-of harm. *See id*. at 17-19.

Parker counters that:

Counts I and IV (Excessive Force)

1.      Summary judgment in favor of the individual officers on Counts I and IV is inappropriate inasmuch as he has produced substantial evidence, including the videotape, that the decision to shoot him with the Taser was not objectively reasonable in the circumstances. *See* Plaintiff's S/J Opposition at 13.

2.      The individual officers are not entitled to qualified immunity inasmuch as (i) it was clearly established at the time that use of excessive force in connection with an arrest violated the Fourth Amendment, and (ii) an objectively reasonable officer would have known that shooting an unarmed, non-threatening person with a 50,000-volt Taser was excessive. *See id.* at 14. The standard for qualified immunity pursuant to the MCRA is not "subjective," as the defendants suggest, but rather is the same objective standard employed with respect to the parallel federal claim. *See id* at 23 n.18.

3.      Caldwell and Bernard had ample opportunity to prevent the use of excessive force upon Parker. *See id.* at 22.

Count III (Negligence)

4.      Gerrish is not entitled to immunity pursuant to the MTCA with respect to Parker's negligence claim inasmuch as a reasonable fact-finder could determine that his actions clearly exceeded, as a matter of law, the scope of any discretion he might have possessed in his official capacity as a police officer. *See id.* at 22-23.

Count II (Municipal Liability)

5.      South Portland and Googins are liable for the city's unconstitutional policies and failure to train officers in the proper use of Taser guns. *See id.* at 23-25.

For the reasons that follow, I conclude that the defendants demonstrate entitlement to summary judgment with respect to all claims against Bernard, Caldwell, Googins in his individual and official capacities, the SPPD and South Portland, but that triable issues remain with respect to Parker's claims against Gerrish.

## A.  Counts I and IV (Excessive Force)

The defendants' bid for qualified immunity with respect to the plaintiff's excessive-force claims sets in motion what the First Circuit has dubbed "a trifurcated inquiry":

We ask, first, whether the plaintiff has alleged the violation of a constitutional right.  If so, we then ask whether the contours of the right were sufficiently established at the time of the alleged violation.  Finally, we ask whether an objectively reasonable official would have believed that the action taken or omitted violated that right.

*Acevedo-Garcia v. Monroig*, 351 F.3d 547, 563-64 (1st Cir. 2003) (citation and internal quotation marks omitted).  "On summary judgment on qualified immunity, the threshold question is whether all the uncontested facts and any contested facts looked at in plaintiff's favor show a constitutional violation."  *Buchanan v. Maine*, 469 F.3d 158, 168 (1st Cir. 2006).  This trifurcated inquiry is dispositive of MCRA, as well as section 1983, claims.  *See, e.g., Ms. K v. City of S. Portland*, 407 F. Supp.2d 290, 298 (D. Me. 2006) ("Claims brought under the Maine Civil Rights Act ("MCRA"), 5 M.R.S.A. § 4681 *et. seq.,* are interpreted in the same manner as claims brought under 42 U.S.C. § 1983, as the state statute is modeled upon the federal.").[78]

With respect to the first prong of the trifurcated inquiry:

To establish a Fourth Amendment violation based on excessive force, a plaintiff must show that the defendant officer employed force that was unreasonable under the circumstances.  Whether the force used to effect a particular seizure is reasonable must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  The reasonableness inquiry is objective, to be determined in light of the facts and circumstances confronting the officers, without regard to their underlying intent or motivation.  There must be careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Jennings v. Jones*, 479 F.3d 110, 119 (1st Cir. 2007) (citations and internal punctuation omitted).

I first consider whether Bernard and Caldwell – who did not deploy Tasers against Parker – are entitled to summary judgment with respect to Counts I and IV.  In his complaint, Parker alleged that

---

[78] As the plaintiff points out, this court previously has considered and rejected the precise argument made by the defendants that, in the MCRA context, a different, "subjective" standard pertains.  *See* Defendants' S/J Motion at 12; Plaintiff's S/J Opposition at 23 n.18; *Smith v. Jackson*, 463 F. Supp.2d 72, 81-82 (D. Me. 2006) ("Defendants assert that the Maine law standard is 'subjective, rather than objective, reasonableness and an officer is immune unless he uses a degree of force that he feels is unnecessary.' . . .  The state

*(continued on next page)*

"Defendants Gerrish, Caldwell and Bernard used excessive force" against him.  Complaint ¶ 29. He alleged that after he was shot with the Taser, "Officers Googins [sic], Gerrish and Caldwell took [him] to the ground and continued to assault him violently, including stepping on the back of [his] head and other parts of his body."  *Id*. ¶ 25.  The Complaint did not allege that either Caldwell or Bernard failed to intervene to stop Gerrish from employing excessive force.  *See generally id*.

Parker now apparently has rethought his theory of Caldwell's and Bernard's liability: In opposing summary judgment, he does not argue that either officer employed excessive force against him after he was Tased but rather contends that both could be found liable for failing to prevent Gerrish's use of the Taser.  *See* Plaintiff's S/J Opposition at 22; s*ee also, e.g., Zambrana-Marrero v. Suarez-Cruz*, 172 F.3d 122, 124 n.2 (1st Cir. 1999) ("An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance if he had a realistic opportunity to prevent the other officer's actions.") (citation and internal punctuation omitted).  The defendants argue, *inter alia*, that a "failure to intervene" theory is not discernible in the Complaint and cannot be raised for the first time in opposition to summary judgment.  *See* Defendants' S/J Motion at 12.  I agree.  A plaintiff cannot seek to resist summary judgment by cobbling together, for the first time in an opposition memorandum, entirely new theories of liability – at least not where, as here, no excuse is offered for such tardiness. *See, e.g., Logiodice v. Trustees of Me. Cent. Inst.*, 170 F. Supp.2d 16, 30-31 n.12 (D. Me. 2001), *aff'd*, 296 F.3d 22 (1st Cir. 2002) (declining to consider "theory of liability . . . not detectable in the Complaint"; observing, "Plaintiffs are not entitled to raise a new theory of liability for the first time in opposition to a motion for summary judgment."); *see also, e.g., Torres-Rios v. LPS Labs., Inc*., 152 F.3d 11, 15-16 (1st Cir. 1998) (district court did not abuse discretion in denying, as belated, motion to

---

standard, like the federal standard, is objective.  Since the standard for the state claim is the same as the federal standard, the result (*continued on next page*)

amend complaint to add claim raised for first time in opposition to motion for summary judgment). Parker's failure-to-intervene claim accordingly is not cognizable.        To the extent that Parker continues to press a claim that Bernard and Caldwell personally employed excessive force against him, the cognizable facts, even viewed in the light most favorable to Parker, reveal nothing resembling a violent assault.  Someone – it is not clear who – pulled Parker's arms backward as he lay on the ground.  This caused Parker pain but was consistent with completion of the handcuffing process. Parker felt an officer's boot forcefully pushing his head into the ground (the defendants say this was Bernard's knee), after which he tasted blood in his mouth.  Parker was at the time agitated, swearing, spitting and yelling, particularly at Caldwell.  There is no indication that Bernard continued to apply force to Parker's head (whether by boot or knee) after completion of the handcuffing or that Parker suffered anything more than minor injury as a result of the use of that force.

The Fourth Amendment permits police officers to use "objectively reasonable" force to effectuate an arrest. *Graham v. Connor,* 490 U.S. 386, 396-97 (1989).  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Peña-Borrero v. Estremeda*, 365 F.3d 7, 12 (1st Cir. 2004) (citations and internal quotation marks omitted).  There is no need to go beyond the first prong of the trifurcated inquiry: On these facts, no reasonable juror could find an underlying Fourth Amendment or MCRA violation consisting of use of excessive force on the part of Bernard or Caldwell against Parker.  Bernard and Caldwell accordingly are entitled to summary judgment as to Counts I and IV.

I turn to the question whether Gerrish is entitled to summary judgment as to Parker's excessive-force claims.  At the outset, it is worth noting that both Parker and the defendants overstate the impact of the videotape evidence.  Parker asserts: "[T]his Court needs look no further than the police-

---

must be the same for the same reasons.") (citations and footnote omitted).

surveillance videotape to find that the use of the Taser on [him] was excessive." *See* Plaintiff's S/J Opposition at 1.  The defendants contend: "The video shows a large, muscular man (5'8" 220 pounds), who is visibly intoxicated, uncooperative, hostile, challenging and belligerent toward the police officers by his use of both obscene language and physical gestures."  Defendants' S/J Reply at 1. However, given the fixed and limited angle from which the videotape was shot and its lack of sound, it neither definitively supports nor refutes Parker's allegation that the use of the Taser against him on July 20, 2005 constituted excessive force.  At a number of moments, including the critical moments just before the Taser was fired, one's view of Parker and/or his hands, arms and shoulders is partly or wholly obscured by Parker's or Caldwell's body.  In any event, even when Parker is visible, the view of him from the camera is not the same view Gerrish, Caldwell and Bernard had.  Finally, during much of the footage, Caldwell and Bernard are out of range of the camera.  Given these shortcomings, the videotape is subject to differing interpretations.  The testimony of those who were present must fill in the blanks.  *Compare, e.g., Scott v. Harris*, 127 S. Ct. 1769, 1775-76 (2007) (in case in which police videotape "quite clearly contradict[ed]" version of high-speed-chase set forth by respondent, in which version respondent's driving posed little, if any, actual threat to pedestrians or other motorists, Court of Appeals erred in accepting respondent's version even though he was nonmovant on summary judgment; observing, "Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.")

That having been said, the defendants' testimonial and videotape evidence reveals that (i) Parker was a large, muscular man whom the officers quickly and reasonably surmised was intoxicated, and (ii) Parker's demeanor and gestures indicate he became frustrated and agitated as he encountered difficulty performing Gerrish's sobriety tests and as he spied Caldwell enter the scene.

36

On the other hand, Parker's testimonial and videotape evidence paints a picture of a person who, despite his intoxication and frustration, was attempting in the main to comply with police orders and whose conduct did not reasonably justify deployment of a 50,000-volt Taser.  This evidence includes the following:

1.      Parker was stopped for a moving violation (speeding), not a serious crime.  While officers quickly came to suspect him of having operated under the influence and ultimately developed probable cause to arrest him for that crime, he posed no immediate danger on that front once he had stopped his truck.

2.      Parker was unarmed and, at the time of the Tasering, surrounded by three police officers, one of whom (Gerrish) was taller and heavier than he was.  Parker attempted to perform the sobriety tests he was told to perform.  After failing the one-leg-stand test, he turned around and placed his hands on the back of his truck, a stance that officers could only reasonably interpret as submission to his inevitable arrest.

3.      Parker did not punch, kick, assault, attempt to assault or physically threaten the officers or anyone else during his entire encounter with them.  Nor did he attempt to flee.

4.      Until Caldwell took the handcuffs from Gerrish, Caldwell was standing with his hands in his pockets – not a stance that one would associate with concern that Parker posed a threat.  Had Bernard believed that Parker posed an imminent risk to the officers, he would have run, not walked, when he crossed the street to lend any needed assistance.

5.      At the point Gerrish fired his Taser, Caldwell was succeeding in completing his handcuffing of Parker.  Caldwell acknowledges that Parker had relaxed his right hand as requested.  Parker felt Caldwell pull his hands apart and twist his right wrist in a counterclockwise direction just before Parker was shot with the Taser.  Caldwell never asked Gerrish or Bernard to fire their Tasers.

Bernard saw no need to fire his.  If Bernard had felt Parker had posed an imminent risk of harm to any of the officers, he would have fired it.  In addition, when Tased, Parker was standing facing his truck, with his back to the officers and his hands behind his back.

6.      Gerrish himself acknowledges that from the time of the initial traffic stop to the point of Tasing, the momentary movement of Parker's right arm as Caldwell was endeavoring to handcuff him was the only conduct he saw that he would characterize as assaultive on Parker's part.  Yet Parker adduces evidence that the handcuffing process itself can cause an arrestee, particularly a burly one such as himself, to flinch or tense as handcuffs are being applied.  Moreover, Gerrish acknowledges that he could not see Parker's right arm because he was on Parker's left side, and Parker's body was blocking Gerrish's view of Parker's right arm.

7.      According to Parker, no one warned him that he might be shot with a Taser (despite opportunity to do so) – a fact that, if credited, tends to weigh in favor of a finding of the overall unreasonableness of the Taser usage.

8.      Although Parker adduces no cognizable evidence of any serious or lasting injury, he need not do so for purposes of an excessive-force claim.  *See, e.g., Bastien v. Goddard,* 279 F.3d 10, 14 (1st Cir. 2002) ("Our inquiry quickly reveals that . . . liability may be imposed for the use of excessive force even in the absence of a serious injury. . . .  Although the severity of the injury also may be considered, we have stated explicitly that a 'serious injury' is not a prerequisite to recovery[.]") (citations, footnote and internal quotation marks omitted).  It cannot be doubted that the experience of being unexpectedly shot by a Taser was a decidedly unpleasant one for Parker.  He could not breathe, lost control of his muscles and fell to the ground, striking his left elbow and suffering pain in his left arm and knee.

38

In short, on Parker's version of the facts, one could conclude that (i) he did not pose a threat to the officers or anyone else, was not attempting to flee and was not actively resisting arrest, (ii) he could not reasonably have been perceived as being or doing any of those things, and (iii) use of force in the form of a 50,000-volt Taser shot accordingly was objectively unreasonable. *See Rios v. City of Fresno,* No. CV-F-05-644 OWW/SMS, 2006 WL 3300452, at *9-*10 (E.D. Cal. Nov. 14, 2006) (arrestee shot by Taser generated triable excessive-force question when, despite defendants' evidence that he was belligerent, uncooperative, displaying frustration and anger and pulled his arms away from officers, refusing to be handcuffed, there was dispute of material fact whether he resisted arrest in any way and was cooperative, as he maintained); *Beaver v. City of Federal Way*, No. CV05-1938MJP, 2006 WL 3203729, at *1-*2 (W.D. Wash. Nov. 3, 2006) (arrestee who claimed to have been shot eight times by Taser generated triable excessive-force question when he adduced evidence that his movements while on ground after being initially shot by Taser were, and could reasonably have been perceived to have been, results of confusion from intoxication and pain from initial Taser shot rather than indicia of active resistance to arrest); *Harris v. County of King*, No. C05-1121C, 2006 WL 2711769, at *1, *3 (W.D. Wash. Sept. 21, 2006) (arrestee generated triable excessive-force question when he adduced evidence that, despite his arguable earlier "active resistance" to arrest, he had fully complied with officers' orders and had his back toward them and hands up in air when two officers shot him with Taser, striking him in back and causing severe pain); *Hudson v. City of San Jose*, No. C-05-03015 RS, 2006 WL 1128038, at *4 (N.D. Cal. Apr. 27, 2006) (arrestee generated triable excessive-force question when he adduced evidence that, despite continuing to grip officer's arm after he and officer had fallen to ground, arrestee was pinned underneath officer, who had "pretty much" detained him, and arrestee therefore was not "necessarily resisting with sufficient force and efficacy that it was reasonably necessary to use a taser – or a baton – on him.") (footnote omitted); *DeSalvo v.*

*City of Collinsville*, No. 04-CV-0718-MJR, 2005 WL 2487829, at *4 (S.D. Ill. Oct. 7, 2005) (arrestee generated triable excessive-force question when he adduced evidence that officer Tased him on the neck solely because he persisted in asking why he was being arrested, and that he was not physically resisting arrest or struggling with the officer in any manner).[79]

Moving to the second prong of analysis – "whether the contours of the right were sufficiently established at the time of the alleged violation[,]" *Monroig*, 351 F.3d at 563 (citation and internal quotation marks omitted) – the defendants suggest (and my research confirms) that as of July 20, 2005 neither this court nor the First Circuit had addressed the lawfulness of use of a Taser to aid in effectuating an arrest. *See* Defendants' S/J Motion at 11.[80] The defendants contend that "there is no clearly established law prohibiting the use of the Taser in the face of a hostile arrestee, who has

---

[79] I agree with Parker that cases cited by the defendants in which officers were found entitled to summary judgment in the face of claims of excessive force emanating from Taser use are distinguishable. *See* Plaintiff's S/J Opposition at 19-20 & n.16. In those cases, there was no material issue that the arrestee had been repeatedly noncompliant with police directives, had attempted to flee or had wielded weapons. *See* Defendants' S/J Motion at 11-12; *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (affirming grant of summary judgment in favor of defendant when, "[i]n the circumstances of this case, [defendant's] use of the taser gun to effectuate the arrest of [plaintiff] was reasonably proportionate to the difficult, tense and uncertain situation that [defendant] faced in this traffic stop, and did not constitute excessive force. From the time [plaintiff] met [defendant] at the back of the truck, [plaintiff] was hostile, belligerent, and uncooperative. No less than five times, [defendant] asked [plaintiff] to retrieve documents from the truck cab, and each time [plaintiff] refused to comply. Rather, [plaintiff] accused [defendant] of harassing him and blinding him with the flashlight. [Plaintiff] used profanity, moved around and paced in agitation, and repeatedly yelled at [defendant]."); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044-45 (6th Cir. 1992) (concluding that district court had erred in refusing to grant summary judgment to defendant officer with respect to claim that Taser usages constituted excessive force; determining that, although officer may have used excessive force during initial Tasering, plaintiffs had failed to show that clearly established law rendered officer's actions unconstitutional in circumstances in which officer confronted suspect who was armed with knives, had made a number of threatening statements to officers and was considered potentially homicidal and suicidal, and officer was attempting to obviate need for lethal force); *Wylie v. Overby*, No. 05-CV-71945-DT, 2006 WL 1007643, at *9 (E.D. Mich. Apr. 14, 2006) (granting defendants' motion to dismiss or for summary judgment in circumstances in which fleeing arrestee was shot with Taser after turning toward officers and starting to put his hands up; noting, "Even taking as true Plaintiff's testimony about starting to 'give up' in the heat of the few tense and uncertain seconds in which these events occurred, the court nonetheless concludes that no reasonable officer would be expected to read Plaintiff's mind and instantly know that what had theretofore been Plaintiff's attitude of insolence, struggle and flight had suddenly become cooperation, surrender and peace . . . based only upon Plaintiff turning and beginning to raise his hands."); *DeVoe v. Rebant*, No. 05-71863, 2006 WL 334297, at *6 (E.D. Mich. Feb. 13, 2006) (granting summary judgment in favor of defendants on excessive-force claim in case in which plaintiff was "hostile and uncooperative" immediately upon being approached by officers, repeatedly ignored requests for identification, yelled at officers and refused order to enter patrol car, whereupon he was shot with Taser). I decline Parker's invitation to compare the police surveillance videotape relied on by the court in *Draper* with the conduct at issue in the instant case. *See* Plaintiff's S/J Opposition at 20 n.15. The *Draper* videotape, which was not referred to in the plaintiff's statements of opposing and additional material facts, *see generally* Plaintiff's Opposing SMF; Plaintiff's Additional SMF, is not part of the evidence cognizable on summary judgment. *See* Loc. R. 56(c).

[80] Inasmuch as appears from my research, the Supreme Court had not addressed that question as of July 20, 2005, either, and has not (*continued on next page*)

40

ignored officer presence, verbal commands, and hands-on contact and who had refused to comply with orders to submit and then physically resisted police attempts to take him into lawful custody." *Id*. "Conversely," they assert, "there is ample case law to support the defense that the use of a Taser to temporarily incapacitate a resisting subject is reasonable, given that other alternatives to overcome resistance, such as physically overpowering the arrestee, using a baton or other impact weapon, or using chemical agents all carry their own risks to both the officers and the arrestee." *Id*. (citing *Draper*, *Russo*, *Wylie* and *DeVoe*).

Nonetheless, the cognizable facts, taken in the light most favorable to Parker, paint a picture of an unarmed arrestee who was surrounded by three officers and endeavoring to comply with their directives (albeit grudgingly) when suddenly, without forewarning, he was Tased. As discussed above, Parker's version of events stands in sharp contrast to the facts of *Draper*, *Russo*, *Wylie* and *DeVoe*, in which there was no material issue that the arrestee had flaunted repeated officer commands, attempted to flee or wielded weapons prior to being Tased.

The defendants do not dispute that (i) the Taser is designed to deliver a 50,000-volt shock, (ii) the shock overrides the body's central nervous system, causing total incapacitation of the muscles and instant collapse, (iii) on the use-of-force continuum, the Taser falls in the highest category of force, just one step down from the use of deadly force, (iv) the Taser can cause severe muscle contractions that may result in injuries to muscles, tendons, ligaments, backs and joints, and stress fractures, and (v) in a number of cases, individuals have died in custody after being Tased. In the circumstances, the Taser fairly can be characterized – as it has been by one court – as "a significantly violent level of force." *DeSalvo*, 2005 WL 2487829, at *4. Inasmuch as Gerrish subjected himself to a Taser shot as part of his training, one can draw a reasonable inference in Parker's favor that Gerrish fully

---

done so to date.

appreciated that deployment of a Taser does in fact constitute a significantly violent level of force. For purposes of the second prong of qualified-immunity analysis, it therefore is appropriate to inquire whether, as of July 20, 2005, it was clearly established that, in the scenario Parker posits (that of an unarmed arrestee who is (i) suspected of having committed a minor crime, (ii) not actively resisting arrest, (iii) not trying to flee and (iv) not posing an imminent threat of harm to officers or others), the use of a significantly violent level of force was unlawful.[81]

The answer to the question, so framed, is yes. *See, e.g., Payne v. Pauley*, 337 F.3d 767, 780 (7th Cir. 2003) ("It was . . . well established [as of May 31, 1998] that it was unlawful to use excessively tight handcuffs and violently yank the arms of arrestees who were not resisting arrest, did not disobey the orders of a police officer, did not pose a threat to the safety of the officer or others, and were suspected of committing only minor crimes."); *Niznik v. City of Minneapolis*, Civil File No. 05-1169 (MJD/AJB), 2007 WL 270416, at *7 (D. Minn. Jan. 29, 2007) ("[Plaintiff] has presented evidence demonstrating that he was complying with [officer/defendant's] orders when [officer/defendant] twisted his arm, threw him onto the seat, slammed his head into the concrete, and stood on his neck. Under clearly established law [as of June 6, 2003], such force was excessive when applied to a plaintiff who had committed no crime, was not resisting the officer, and posed no visible threat."); *Harris*, 2006 WL 2711769, at *3 (deeming it clearly established, as of June 30, 2003, that

---

[81] The caselaw need not have specifically established that usage of a Taser in such circumstances was unlawful for its unlawfulness to have been apparent to a reasonable officer at the time. *See, e.g., Jennings*, 479 F.3d at 124 ("[T]he law is clearly established either if courts have previously ruled that materially similar conduct was unconstitutional, or if a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct at issue.") (citations and internal punctuation omitted); *DeSalvo*, 2005 WL 2487829, at *4 ("[Defendant] does argue . . . that a citizen's right to be free from being tased is not a clearly established right, in that there is no clearly analogous case specifically establishing a right to be free from tasing. While this may or may not be the case, this Court finds that [defendant's] argument implicitly asserts a definition of [plaintiff's] right that exceeds the appropriate level of specificity. [Plaintiff's] right in this case, defined at an *appropriate* level of specificity, poses to the Court a broader question: does a restrained person have a right to be free from a significantly violent level of force if he is, while perhaps not fully compliant with an officer's orders, acting in an otherwise peaceable manner? In answering *this* question, the Court finds the fact that [defendant] used a taser to inflict pain upon [plaintiff], rather than some other weapon, is of diminished importance.") (emphasis in original).

police officer may not use Taser gun on arrestee to effectuate arrest when arrestee is complying with officer's orders and has already turned around and put his hands over his head at officer's direction).

I move to the third and final prong of qualified-immunity analysis, entailing consideration of "whether an objectively reasonable official would have believed that the action taken violated that clearly established constitutional right." *Jennings*, 479 F.3d at 126 (citation and internal quotation marks omitted).  The First Circuit recently observed:

> At first glance, this inquiry appears indistinguishable from that in the first prong.  Both involve the reasonableness of the officer's conduct.  However, the key distinction is that prong one deals with whether the officer's conduct *was* objectively unreasonable, whereas prong three deals with whether an objectively reasonable officer would have *believed* the conduct was unreasonable.

*Id*. at 126 (emphasis in original).

Despite this "added measure of protection[,]" *id*. at 127, Gerrish falls short of proving entitlement to summary judgment as to Counts I and IV on qualified-immunity grounds.  I am mindful that Parker was a large, muscular, intoxicated, frustrated arrestee and that, during Caldwell's handcuffing of him, at least from the limited vantage point of the police-car videocamera, Parker's right shoulder appeared to move upward and Caldwell stepped backward.  Nonetheless, on Parker's cognizable version of the facts, which is not clearly refuted by the videotape and therefore must be accepted for purposes of summary judgment, Parker was submitting to arrest, did not move his arm or shoulder in any manner that reasonably could have been construed as a threat to Caldwell or others, and remained within Caldwell's control, with his back to Caldwell and Caldwell twisting his free arm counterclockwise in preparation to handcuff his free wrist, just as Gerrish subjected him without warning to the significantly violent force of a Taser deployment.  On the defendants' version of the facts, Gerrish may well be able to convince a trier of fact that, at the moment he Tased Parker, he held an objectively reasonable, even if mistaken, belief that Caldwell could not safely complete the process

of taking Parker into custody.  Nonetheless, for purposes of the instant motion and accepting as true Parker's version of events, an objectively reasonable officer would have believed that the Tasing of Parker violated a clearly established constitutional right.  *See id.* at 127 (while court was sympathetic to situation defendant officer confronted, in which plaintiff had to be subdued while resisting arrest, "and the chaos caused by his struggle may have made it difficult for [defendant officer] to gauge the appropriate level of force[,]" facts taken in the light most favorable to jury verdict indicated defendant officer increased, rather than merely maintained, force applied to plaintiff's ankle even after plaintiff ceased resisting and complained he was being hurt; in that circumstance, "even the added measure of protection provided by the third prong of the qualified immunity analysis [did] not insulate [officer defendant] from damages.") (citation and internal quotation marks omitted). [82]

The defendants accordingly fall short of establishing Gerrish's entitlement to summary judgment as to Counts I and IV.

### B.  Count III (Negligence)

The defendants next argue that "[i]n the absence of any bad faith or conduct so egregious as to vitiate their immunity," Gerrish, Bernard and Caldwell are entitled pursuant to the MTCA to immunity with respect to Parker's negligence claim (Count III).  *See* Defendants' S/J Motion at 15; *see also, e.g., Smith*, 463 F. Supp.2d at 81 ("[T]he MTCA affords police officers discretionary immunity except to the extent they act in a manner so egregious as to clearly exceed, as a matter of law, the scope of any

---

[82] The defendants also move for summary judgment as to Gerrish on Counts I and IV on the ground that his conduct was not intentional.  *See* Defendants' S/J Motion at 10 (citing, *inter alia, Brower v. Inyo County*, 489 U.S. 593 (1989)).  This argument plainly is without merit.  While Gerrish may not have "intentionally act[ed] to deprive Plaintiff of his right to be free from excessive force[,]" as the defendants posit, *see id.*, he acted "intentionally" in the sense that matters for these purposes: He intentionally Tased Parker, *see, e.g., Brower*, 489 U.S. at 596 ("Violation of the Fourth Amendment requires an intentional acquisition of physical control."); *Kopec v. Tate*, 190 Fed. Appx. 125, 128 (3d Cir. 2006) ("While the district court misstated the law when it instructed the jury that section 1983 enables citizens to seek redress against any person who 'intentionally deprive[s] that citizen of' his rights, immediately thereafter, the district court clarified the instruction and stated that the plaintiff must show that the 'defendant intentionally committed acts which operated to deprive the plaintiff' of his rights.  This is merely a recognition that Fourth Amendment violations (*continued on next page*)

44

discretion they could have possessed in their official capacity as police officers.") (citation and internal punctuation omitted).

Parker makes no argument against summary judgment in favor of Bernard and Caldwell as to this claim, *see* Plaintiff's S/J Opposition at 22-23, effectively conceding that it cannot be maintained against them, *see, e.g., Grenier v. Cyanamid Plastics, Inc*., 70 F.3d 667, 678 (1st Cir. 1995) ("If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal.") (citations and internal quotation marks omitted); *Shapiro v. Haenn*, 222 F. Supp.2d 29, 44 (D. Me. 2002) (to survive summary judgment on certain count, "Plaintiff was required to inform the Court of the reasons, legal or factual, why summary judgment should not be entered.") (citation and internal quotation marks omitted).  In any event, for reasons discussed above in the context of the defendants' bid for summary judgment as to Parker's excessive-force claims, the conduct of Bernard and Caldwell during Parker's July 20, 2005 arrest was not so egregious as to clearly exceed the scope of any discretion they could have possessed as police officers.  Bernard and Caldwell accordingly are entitled to discretionary immunity, and summary judgment, with respect to Count III.

I reach a different conclusion with respect to Parker's claim of negligence against Gerrish. Crediting Parker's version of events, Gerrish's conduct on July 20, 2005 could be found to have clearly exceeded the scope of any discretion he possessed as a police officer.  *See Smith*, 463 F. Supp.2d at 79, 81 (denying MTCA discretionary immunity and summary judgment as to negligence claim when, on plaintiff's version of facts, defendant officer had slammed his face into a concrete walkway although plaintiff was not resisting arrest or posing any threat to officers apart from "ever-present risk" an intoxicated person presents any officer).

---

require intentional *actions* by officers, rather than the accidental effects of otherwise lawful government conduct.") (citations and (*continued on next page*)

## C.  Count II (Municipal Liability)

The defendants finally seek summary judgment as to Parker's municipal-liability claims against South Portland, the SPPD and Googins (Count II).  *See* Defendants' S/J Motion at 15-20.  As a threshold matter, the defendants correctly argue, and Parker does not contest, that the SPPD is not a proper defendant for purposes of a section 1983 municipal-liability claim.  *See id*. at 15-16; Plaintiff's S/J Opposition at 23-25; *see also, e.g*., Fed. R. Civ. P. 17(b) (capacity to sue and be sued, with respect to parties other than individuals and corporations, is determined (with exceptions not here relevant) by the law of the state in which the district court is held); 30-A M.R.S.A. § 2002 ("The residents of a municipality are a body corporate which may sue and be sued, appoint attorneys and adopt a seal.");  14 M.R.S.A. § 8102(2)-(3) (police departments not among political subdivisions defined as "governmental entity"); *see also, e.g., Cronin v. Town of Amesbury,* 895 F. Supp. 375, 383 (D. Mass. 1995), *aff'd,* 81 F.3d 257 (1st Cir.1996) (entities that are integral part of town, such as police department, lack legal identity apart from town and therefore are not properly named as defendants in section 1983 suit).  The defendants accordingly are entitled to summary judgment as to all claims against the SPPD.

This leaves Parker's claims against Googins and South Portland.  *See* Complaint ¶¶ 32-37. Parker clarifies, in opposing summary judgment, that he continues to press claims predicated on Googins' and South Portland's (i) adoption of an allegedly deficient Taser-usage policy and (ii) failure to train officers properly in Taser usage.  *See* Plaintiff's S/J Opposition at 23-25.  In so doing, he effectively waives claims predicated on alleged negligent hiring, supervision and discipline. *See* Complaint ¶ 33; *see also, e.g., Grenier,* 70 F.3d at 678; *Shapiro*, 222 F. Supp.2d at 44.  In any event, even assuming *arguendo* that such claims are not waived, the defendants adduce uncontroverted

---

internal quotation marks omitted) (emphasis in original).

evidence that (i) Googins was not involved in hiring Bernard or Caldwell, (ii) although Gerrish was hired during Googins' tenure as chief of police, nothing in Gerrish's prior employment revealed any problems with his use of force that would have raised concerns about his hiring, (iii) prior to the event in question, the SPPD had received no complaints about Taser use by its officers in connection with physical arrests, and (iv) there was no history of inappropriate use of force by Bernard, Caldwell or Gerrish that would have put South Portland on notice of any problems regarding unreasonable use of force by those officers or the need for additional training or supervision. Accordingly, the defendants are entitled to summary judgment as to Count II to the extent it is predicated on claims of negligent hiring, supervision and discipline.

The defendants next seek summary judgment as to any claims asserted against Police Chief Googins in his individual capacity on the ground that Googins is entitled to qualified immunity, his conduct not having violated any clearly established law. *See* Defendants' S/J Motion at 13. Although Parker captioned the instant suit as one against Googins in both his individual and official capacities, *see* Complaint at 1, he tenders no response to this point in his brief opposing summary judgment, effectively waiving any claim against Googins personally, *see* Plaintiff's S/J Opposition at 23-25; *see also, e.g., Grenier*, 70 F.3d at 678; *Shapiro*, 222 F. Supp.2d at 44.[83]

In any event, even assuming *arguendo* that any claim against Googins in his individual capacity is not waived, Parker falls short of demonstrating that Googins fairly could be characterized as having been "deliberately indifferent" to the rights of citizens such as Parker to be free from excessive force, *see Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994) – or that, even

---

[83] Parker's suit against Googins in his official capacity is effectively a suit against South Portland, not a suit against Googins personally. *See, e.g., Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."); *Bisbal-Ramos v. City of Mayagüez*, 467 F.3d 16, 20 n.1 (1st Cir. 2006) ("[A] claim against Pérez in his official capacity is essentially a claim against the City[.]").

assuming a sustainable underlying claim of supervisory liability, the right Googins is alleged to have

violated was clearly established as of the relevant time.

> With respect to claims of supervisory liability:
>
> Under 42 U.S.C. § 1983 . . . [a]bsent participation in the challenged conduct, a supervisor can be held liable only if (1) the behavior of his subordinates results in a constitutional violation and (2) the supervisor's action or inaction was affirmatively linked to the behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence of the supervisor amounting to deliberate indifference.  Deliberate indifference will be found only if it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights.  The affirmative link requirement contemplates proof that the supervisor's conduct led inexorably to the constitutional violation.

*Bisbal-Ramos*, 467 F.3d at 24 (internal punctuation omitted).

Parker adduces evidence from which a reasonable trier of fact could conclude that (i) SPPD

policies in effect on July 20, 2005 permitted use of a Taser, at least in some circumstances, on a

subject who is merely passively resisting arrest, (ii) in training officers in the use of Tasers, the SPPD

provided no guidance on the circumstances in which it is appropriate to use them, and, (iii) per

Parker's expert, Ryan, the decision to use a Taser to gain compliance for purposes of overcoming

passive resistance is inconsistent with generally accepted practices, training and model policies

related to the use of electronic control devices.  Ryan does not expressly state that this was the case as

of July 20, 2005; however, for that proposition he cites a model IACP policy that the defendants

acknowledge was published in January 2005.  *See* Plaintiff's Additional SMF ¶ 193; Ryan Aff. ¶ 48;

Defendants' S/J Reply at 4.

Nonetheless, while this evidence suffices to permit a reasonable trier of fact to conclude that

the SPPD's use-of-force policies and training were deficient with respect to use of Tasers, it does not

establish that in adopting or condoning those policies or training practices Googins was deliberately

indifferent to the right of citizens such as Parker to be free from the use of excessive force. "Deliberate

indifference" is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410 (1997).  There is no evidence that Googins actually knew that the policies or training in question were deficient or that they were highly likely to lead to violation of individuals' constitutional rights.  Nor is there any evidence establishing a pattern or practice of problems that would have put Googins on notice of such a likelihood.  *Compare, e.g., id*. at 407 (observing that municipal decisionmakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference' – necessary to trigger municipal liability").  To the contrary, it is undisputed that the SPPD received not a sole complaint regarding Taser usage prior to that of Parker and made no determination that any Taser usage had been excessive.  Further, the defendants adduce undisputed evidence that SPPD officers were in fact trained in the lawful use of force in connection with arrests and that Gerrish specifically was trained in "the lawful use of force in connection with arrests, including all weapons he is issued[,]" Defendants' SMF ¶ 4; Plaintiff's Opposing SMF ¶ 4, among them a Taser, *see id*. ¶ 5.  Thus, while Gerrish may not have received training in appropriate uses of the Taser during the Taser-certification process, he evidently received such training as part of his general education in the lawful use of force.  In these circumstances, it is particularly difficult to discern how any deficiencies in the training of South Portland's officers would have been apparent to Googins and/or South Portland.

In this vacuum, Parker offers only Ryan's opinion, buttressed by citation to a 2005 model IACP policy, that use of a Taser to overcome passive resistance is inconsistent with generally accepted policies, procedures and training.  That evidence, standing alone, neither demonstrates nor permits a reasonable inference that it was manifest in July 2005 that use-of-force policies or Taser-training

programs such as those of the SPPD entailed a serious risk of excessive-force Taser usage.   *See*

*Stokes v. Bullins*, 844 F.2d 269, 275 (5th Cir. 1988) (ruling that district court erred in relying on

expert's testimony that town's failure to conduct NCIC background check on defendant officer

amounted to gross negligence in circumstances in which town employed no more than three officers at

a time, most locals, and never heard of NCIC procedure because it never encountered need to use it;

observing: "First, in so relying, the [district] court has essentially constitutionalized a single criterion

– the NCIC report – for hiring policemen.   Liability for constitutional violations is rarely so

perfunctorily assessed.   Second, an expert's opinion should not be alone sufficient to establish

constitutional 'fault' by a municipality in a case of alleged omissions, where no facts support the

inference that the town's motives were contrary to constitutional standards.") (footnote omitted);

*Dowell v. City of Atlanta*, Civil Action No. 1:04-CV-1837-CAP, 2006 WL 3333758, at *6 (N.D. Ga.

July 20, 2006) (plaintiff's presentation of expert's testimony that police department had deviated from

generally accepted law-enforcement standard of mandatory use-of-force reporting and review

procedures and that this constituted deliberate indifference on part of city did not "control this Court's

legal analysis of whether any need to train and/or supervise was obvious enough to trigger municipal

liability without any evidence of prior incidents putting the municipality on notice of that need")

(citation and internal quotation marks omitted); *Holland ex rel. Holland v. City of Houston*, 41 F.

Supp.2d 678, 704 (S.D. Tex. 1999), *appeal dismissed*, 237 F.3d 632 (5th Cir. 2000) (in excessive-

force case, expert's "testimony concerning generally accepted police custom and practice and proffer

of certain model policies have no bearing on whether [defendant officer] acted within the ambits of the

Constitution").

In any event Parker does not cite, nor can I find, caselaw indicating that as of July 20, 2005 it was clearly established that promulgation of Taser policies and training programs with the deficiencies he has identified was unlawful.

For any or all of the foregoing reasons, the defendants are entitled to summary judgment with respect to any claims against Googins in his individual capacity.

I turn, finally, to Parker's municipal-liability claims against South Portland and Googins in his official capacity. A section 1983 claim against a municipality predicated on inadequate training, like the parallel claim against a supervisor, necessitates a showing of "deliberate indifference" to the likelihood that a constitutional violation will result. *See, e.g., Whitfield v. Meléndez-River*a, 431 F.3d 1, 9-10 (1st Cir. 2005) ("A city's policy of inadequately training its police force can serve as a basis for § 1983 liability if the city's failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. In this context, deliberate indifference will be found where the municipality fails to provide adequate training notwithstanding an obvious likelihood that inadequate training will result in the violation of constitutional rights."). For reasons discussed above, Parker falls short of demonstrating the existence of a triable issue whether, in adopting its Taser training program, South Portland evinced the requisite deliberate indifference.

I turn, finally, to Parker's claim against South Portland and Googins in his official capacity predicated on adoption of an allegedly deficient Taser policy. Parker argues that (i) South Portland is legally responsible for any policy related to use of Taser guns, approved by Googins in his official capacity, (ii) its Taser policy is unconstitutional inasmuch as it permitted use of a Taser against suspects who were merely offering passive resistance, (iii) per Ryan, that policy was inconsistent with generally accepted practices, policies and training in law enforcement, and (iv) that policy was the "moving force" behind use of a Taser on Parker, Gerrish having testified that use of a Taser on a

suspect who is passively resisting is appropriate pursuant to South Portland policy. *See* Plaintiff's S/J Opposition at 24. As Parker implies, to the extent a plaintiff identifies a facially unconstitutional municipal policy from which an alleged harm has flowed, the municipality is presumed to have acted with the requisite deliberate indifference and to have caused the claimed harm. *See, e.g., Brown*, 520 U.S. at 404-05 ("Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward. . . . [P]roof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.") (emphasis in original).

Parker omits to quote, in his statement of additional facts, the text of South Portland's taser and use-of-force policies. *See generally* Plaintiff's Additional SMF. He does adduce evidence that, to varying degrees, Googins, Bernard and Gerrish understood South Portland's policies to permit use of a Taser against a merely passively resisting subject and that, in Ryan's view, use of a Taser in such circumstances is inconsistent with generally accepted law-enforcement practices, policies and training. This does not suffice to demonstrate the facial unconstitutionality of South Portland's policy or policies regarding Taser usage. Parker neither defines the term "passive resistance" nor establishes that – whatever its meaning – Googins, Bernard, Gerrish and Ryan had a common understanding of the term. In any event, as noted above, an expert's testimony that a policy is inconsistent with generally accepted law-enforcement practice does not, standing alone, establish its unconstitutionality. *See, e.g., Bullins*, 844 F.2d at 275; *Dowell*, 2006 WL 3333758, at *6; *Holland*, 41 F. Supp.2d at 704. Nor, finally, can it confidently be said that a policy permitting use of a Taser

52

against a merely passively resisting subject is unconstitutional on its face – that is, with respect to any and all scenarios a law-enforcement officer might confront.  Analysis of the lawfulness of an officer's use of force pursuant to the Fourth Amendment is more nuanced than that.  *See, e.g., Jennings*, 479 F.3d at 119 ("Whether the force used to effect a particular seizure is reasonable must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  The reasonableness inquiry is objective, to be determined in light of the facts and circumstances confronting the officers, without regard to their underlying intent or motivation.  There must be careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.") (citations and internal quotation marks omitted).

In the absence of proof that the policy in question is facially unconstitutional or that South Portland otherwise directly caused the harm of which he complains, Parker is obliged to demonstrate, *inter alia*, that South Portland acted with deliberate indifference in embracing the assertedly deficient policy or policies.  *See, e.g., Brown*, 520 U.S. at 406 ("Claims not involving an allegation that the municipal action itself violated federal law, or directed or authorized the deprivation of federal rights, present much more difficult problems of proof."); *Gibson v. County of Washoe*, 290 F.3d 1175, 1185-86 (9th Cir. 2002) (distinguishing "direct path" to municipal liability, via claim "that a municipality itself violated someone's rights or that it directed its employee to do so[,]" from indirect route, via claim that "through its *omissions* the municipality is responsible for a constitutional violation committed by one of its employees"; noting that traversing latter route necessitates showing "that the municipality's deliberate indifference led to its omission and that the omission caused the employee to

commit the constitutional violation.") (emphasis in original).[84]  For reasons discussed above in the context of considering whether any claim against Googins in his individual capacity survives summary judgment, Parker falls short of doing so.  South Portland, and Googins in his official capacity, accordingly are entitled to summary judgment as to all claims against them.

## IV.  Conclusion

For the foregoing reasons, I recommend that the defendants' motion for summary judgment be **GRANTED** as to all claims brought against Bernard, Caldwell, the SPPD, South Portland and Googins in his individual and official capacities, and otherwise **DENIED**.  Should this recommended decision be affirmed, remaining for trial will be Parker's excessive-force claims (Counts I and IV) against Gerrish only and negligence claim (Count III) against Gerrish only.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum,*

---

[84] Parker also arguably contends that municipal liability can attach in this case through a second direct path besides promulgation of a facially unconstitutional policy:  namely, that Googins, South Portland's law-enforcement policymaker, ratified the allegedly excessive use of Taser force against Parker by embracing the conclusion of the Force Review Board that Gerrish's use of force was appropriate and consistent with South Portland's policies.  *See* Plaintiff's S/J Opposition at 10-11, 24.  "In cases where an investigation has been conducted, courts have been reluctant to impose municipal liability based on a ratification theory."  *Daniels v. City of Columbus*, No. C2-00-562, 2002 WL 484622, at *6 (S.D. Ohio Feb. 20, 2002).  Googins' after-the-fact concurrence in the results of the investigation into this single incident, without more, is insufficient to open the door to municipal liability via the ratification route.  *See, e.g., Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir. 1989) (city could not be held liable pursuant to section 1983 based on its conclusion, following investigations of both incident that sparked complaint and an earlier incident involving same officer, that discipline was not appropriate; "As we have indicated before, we cannot hold that the failure of a police department to discipline in a specific instance is an adequate basis for municipal liability . . . .  Appellant has not offered evidence of a failure to discipline sufficiently widespread to reflect a municipal policy.") (citations omitted); *Sango v. City of New York*, No. 83 CV 5177, 1989 WL 86995, at *20 n.2 (E.D.N.Y. July 25, 1989) ("At the outset, it is not improper to fail to punish an officer for a single incident of illegal behavior. Moreover, conduct occurring after the incident at issue lacks the requisite affirmative link to plaintiffs' injuries – that is, plaintiffs cannot establish causation.  Evidence of a municipal policymaker['s] response to misconduct can be helpful in determining the municipal policy existing before the incident, but it cannot alone serve as the predicate for municipal liability.") (citations and internal quotation marks omitted).  While Parker implies, based on data indicating that South Portland found no unlawful use of force in any case investigated from 2002-05, that the city had a pattern of condoning uses of excessive force, *see* Plaintiff's S/J Opposition at 11 n.8, he adduces no detail from its investigation into his or other cases from which one reasonably could draw that conclusion.

*within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

   *Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

   Dated this 18th day of May, 2007.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge
